NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

D'ARMIGENE, INC., Respondent.

No. 19, Docket 29535.

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1965.

Decided Nov. 22, 1965.

Melvin Pollack, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Bernard M. Dworski, Atty., N. L. R. B., for petitioner.

Bertrand B. Pogrebin, Harry H. Rains, Mineola, N. Y., for respondent.

Before FRIENDLY and KAUFMAN, Circuit Judges, and BRYAN, District Judge.*

* Of the Southern District of New York, sitting by designation.

FREDERICK van PELT BRYAN, District Judge:

The National Labor Relations Board, having found that respondent employer had engaged in unfair labor practices in violation of § 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (3), petitions for enforcement of an order requiring respondent to cease and desist from such practices and to reimburse two discharged employees for lost wages.

The findings of unfair labor practices made by the trial examiner and affirmed by the Board,[1] insofar as they are directly attacked by respondent here, are (1) threatening employees with economic reprisals and promising them economic benefits during union organizational activities; (2) interrogating applicants for employment about union membership; and (3) discharging two employees for union membership.

█ The sole issue before us is whether these findings are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (per curiam); National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e). We conclude that the findings as to threats of reprisals and promises of economic benefits and as to the discharge of two employees for union membership are so supported but that the finding as to interrogation of applicants for employment as to union membership is not.

Respondent D'Armigene, Inc. (D'Armigene) is a New York corporation which, since 1952, has manufactured women's uniforms at a plant in Bay Shore, Long Island, employing up to 93 persons.

The events with which we are concerned occurred within the space of a week in June 1963. On Wednesday evening, June 5, representatives of Local 107, International Ladies' Garment Workers Union began a campaign to organize D'Armigene employees by soliciting some of them at their homes. Respondent's president, Mrs. D'Armigene Johnson, was apprised of this the next day. On Friday, June 7, all employees were assembled during working hours and Mrs. Johnson addressed them for half an hour. It is this speech on which the finding of threats of economic reprisals and promises of economic benefits is based.

On Monday, June 10, Jean Crescimanno, a member of Local 107 and its vice president, was discharged. On Tuesday, June 11, Dante Galdi, a member of Local 10, was discharged. On June 12 the D'Armigene employees struck to protest the alleged discriminatory discharges of Crescimanno and Galdi because of union membership.[2]

The proceedings which resulted in the order now before us ensued. They were instituted on a complaint filed by the general counsel after the regional director had dismissed charges instituted by the union.

We will deal separately with each of the four findings to which respondent takes exception.

### (1) Threats of retaliation and promises of benefits

The finding that respondent violated § 8(a) (1) of the Act by threatening its employees with economic reprisals and promising them economic benefits is based on Mrs. Johnson's speech of June 7, 1963.

There is no serious dispute as to the major portion of the speech. Mrs. John-

1. With minor exceptions not here material.

2. In addition to the four findings of violation to which respondent takes exception here, the Board also found that the work stoppage was an unfair labor practice strike and directed that the strikers be reinstated with reimbursement of loss of earnings. Respondent does not directly attack this finding, apparently on the premise that a holding that the other four findings were not supported by substantial evidence would necessarily result in refusal of enforcement.

son described her humble antecedents in Tennessee and dwelt at some length on her problems in overcoming her childhood fear of a bogeyman. She told of her unpleasant experiences in union shops and of her refusal to become a union organizer. She contrasted the "happy family" atmosphere at the D'Armigene plant with the disharmony and unhappiness she had found in unionized plants. She reviewed the difficult times experienced in the early days of the company and emphasized the precarious competitive position with which it was still confronted. Nevertheless she announced imminent improvements in vacation policies and spoke of impending wage increases which she had under consideration. She suggested that any dissatisfied employees were free to leave.

In addition, there was testimony that in response to a question from one of the employees Mrs. Johnson said: "I don't want the union. I won't sign with the union and if it ever comes to that I'll close the place down." At the hearing before the trial examiner she flatly denied that she had said this.

The examiner did not credit Mrs. Johnson's denial and found as a fact that she had threatened to close the plant if it were unionized. His findings as to her credibility and as to what her speech contained are supported by substantial evidence on the record as a whole. The examiner observed the witnesses and there is no basis on this record to question these findings.

■ Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise" of their oganizational rights. 29 U.S.C. § 158(a) (1). The question of violation turns on the motivation for the employer's conduct. See American Ship Building Co. v. N. L. R. B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); N. L. R. B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); N. L. R. B. v. Great Atlantic & Pacific Tea Co., 340 F.2d 690 (2 Cir. 1965). Conduct which by its very nature would have the effect of interference, restraint or coercion carries the implication of unlawful intent. See Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954); N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed. 308 (1963); N. L. R. B. v. Great Atlantic & Pacific Tea Co., supra.

■ The question here then is whether the nature and circumstances of Mrs. Johnson's speech were such as to have the natural and foreseeable effect of interfering with the rights of the employees. This must be determined from the speech itself in the light of the background and circumstances under which it was delivered. E. g., N. L. R. B. v. Kropp Forge Co., 178 F.2d 822, 828 (7 Cir. 1949), cert. den., 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595 (1950).

Viewed in this context it is plain that the speech combined promises of benefits and threats of reprisal timed so as to impinge on the employees' freedom of choice as to whether or not their interests would best be served by unionization. Mrs. Johnson spoke the day after she had learned of the commencement of a campaign for unionization of the plant. She made it clear that she had no use for the union. Dissatisfied employees were pointedly invited to leave. Coupled with this were announcements of imminent improvements in vacation policy and wages. There was a plain "suggestion of a fist inside the velvet glove." N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). See also Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 77 (2 Cir. 1965); N. L. R. B. v. Howe Scale Co., 311 F.2d 502, 504 (7 Cir. 1963); N. L. R. B. v. Philamon Labs., Inc., 298 F.2d 176, 180–181 (2 Cir.), cert. den., 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); N. L. R. B. v. Pyne Molding Corp., 226 F.2d 818, 820 (2 Cir. 1955); Indiana Metal Prods. Corp. v. N. L. R. B., 202 F.2d 613, 620 (7 Cir. 1953); Bok, The Regulation of Campaign Tactics in

Representation Elections Under the National Labor Relations Act, 78 Harv.L. Rev. 38, 112–16 (1964).

The first sans velvet glove appears unmistakably from the threat to close the plant if it were unionized. The coercive purport and effect of the speech as a whole and the consequent violation of § 8(a) (1) are too clear to require further discussion.

(2) *The discharge of Mrs. Crescimanno*

Jean Crescimanno, a sewing machine operator, was a member of the union, as management knew. She was also vice president of the local, though apparently she had taken no part in the organizational campaign.

Mrs. Crescimanno was discharged on the Monday following Mrs. Johnson's speech of June 7. She was told that the reasons were absence and lateness.

It is plain that Mrs. Crescimanno's record of attendance and punctuality left a great deal to be desired. She failed to report for work a total of 20 out of the 69 days she was working at D'Armigene and was frequently late.

However, the quality of her work had often been commended and only a month before she had been given a five dollar raise. She claimed that management knew when she was hired that her family responsibilities would necessitate absence and lateness. There was evidence that this sort of thing was not uncommon among the female operators, many of whom were married and had children, and that there was no adverse reaction from the management. None of the other operators were discharged.

Viewed against the background of Mrs. Johnson's attitude toward unionization which she had expressed in her speech of the previous Friday, the summary discharge of Mrs. Crescimanno under these circumstances permits the inference that it resulted from anti-union animus rather than from legitimate disciplinary considerations. The power of the Board to draw reasonable inferences from the facts in evidence was not curtailed by Universal Camera. Radio Officers' Union v. N. L. R. B., supra, 340 U.S. at 48–50, 71 S.Ct. 456 (1954); see Local 357, International Broth. of Teamsters v. N. L. R. B., 365 U.S. 667, 675, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

The question here is not whether there were in fact legitimate grounds for discharge but rather whether the dismissal was in significant part motivated by proscribed considerations. N. L. R. B. v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2 Cir. 1965); N. L. R. B. v. Whitin Machine Works, 204 F.2d 883, 885 (1 Cir. 1953); see E. Anthony & Sons v. N. L. R. B., 82 U.S.App.D.C. 249, 163 F.2d 22, cert. den., 332 U.S. 773, 68 S.Ct. 89, 92 L.Ed. 358 (1947). It was permissible to draw the inference from the evidence that Mrs. Crescimanno's union membership was a significant reason for her discharge. Accordingly it cannot be said that there was insufficient evidence on the record as a whole to support the finding that her discharge violated § 8(a) (3) of the Act.

(3) *The discharge of Galdi*

Dante Galdi, a union cutter, was discharged on Tuesday, June 11, 1963, the day after the dismissal of Mrs. Crescimanno. The circumstances of Galdi's discharge are in sharp dispute.

Galdi, who had been a member of the union for some twenty years, was hired by D'Armigene in early May, 1963. At that time he expressed concern about accepting employment in a non-union shop because of anticipated difficulties with his local. On May 28 Galdi notified his supervisor Bonventre that he had obtained a job with the postoffice which might come through at any time and that he would take it when an opening arose. Management then advertised for, and on Thursday, June 6, hired, a replacement cutter, Zuaro, who reported for work on Monday, June 10.

When Galdi learned on Friday, June 7, of the union activity at the plant he expressed regret at having taken a job in a non-union shop when an organizational drive was getting under way. On Monday, June 10, he went to union head-

quarters to pick up his vacation pay and did not report for work. That evening two union delegates visited him at his home and complained of his working in a non-union shop without a permit.

Galdi testified that on Tuesday, June 11, Bonventre told him that he was fired. This took place, he said, despite an agreement on the previous Friday that even though Zuaro had been hired he would continue to work until called to his post-office job. He further testified that Mrs. Johnson told him in substance that while he was a good man and she hated to see him go, she felt that as a union man he would "vote the union way."

The respondent's version of what occurred was quite different. Bonventre, Mrs. Johnson and the D'Armigene comptroller all testified in substance that Galdi had not been fired but had left voluntarily because he was in trouble with the union and perhaps also because his postoffice job would soon be available.

The trial examiner accepted Galdi's version of what had happened. He expressly found that Galdi's testimony was "extremely" credible and that the testimony of respondent's witnesses was unworthy of belief. On the basis of this credibility evaluation the examiner concluded that Galdi had been discharged by respondent and that the discharge occurred because he was a union member.

After the Board's order had been entered respondent moved to reopen the record and for reconsideration on the basis, among other things, of testimony given by Zuaro at a subsequent hearing on the D'Armigene election to the effect that management knew he was a union member when he was hired as a replacement for Galdi. This motion was denied.

Respondent urges, first, that the findings as to the Galdi discharge cannot be sustained by the record before the examiner, and second, that in any event the Board erred in refusing to receive the subsequent Zuaro testimony which would have necessitated a finding in respondent's favor.

On the first point the respondent argues that the evidence before the examiner on this issue was so overwhelmingly in its favor as to compel a finding that Galdi left voluntarily. It may be that the probabilities support respondent's version of Galdi's dismissal. But we are not called upon here to deal with the probabilities. Nor are we required to agree with the findings under review.

The trial examiner's determination turned on a question of credibility— which the examiner was in a much better position to resolve than a reviewing court. Galdi's testimony as to the circumstances of his discharge, if true, unequivocally showed that he had been discharged for impermissible reasons. His version of what occurred may have been unlikely and there are inconsistencies in his testimony which cast doubt on his reliability as a witness. However, where, as here, independent evidence indicates the existence of hostility toward unionization, we are not persuaded that the examiner's finding as to Galdi's discharge is so unreasonable as to be unsupported by substantial evidence in the record considered as a whole. In N. L. R. B. v. James Thompson & Co., 208 F.2d 743, 746 (2 Cir. 1953), Judge Learned Hand said:

"Over and over again we have refused to upset findings of an examiner that the Board has affirmed, not because we felt satisfied that we should have come out the same way, had we seen the witnesses; but because we felt bound to allow for the possible cogency of the evidence that words do not preserve. We do not see any rational escape from accepting a finding unless we can say that the corroboration of this lost evidence could not have been enough to satisfy any doubts raised by the words; and it must be owned that few findings will not survive such a test."

Nor are we persuaded that the Board erred in refusing to reopen the record to receive Zuaro's subsequent testimony that management knew he was a union

member. Respondent's supervisor Bonventre could have testified to the same effect at the original hearing but was not questioned on the subject. Zuaro's testimony was not newly discovered evidence nor did it present "extraordinary circumstances" requiring reopening under the Board's regulation. N.L.R.B.Reg. § 102.48(d).

### (4) *Interrogation of job applicants as to union membership*

The trial examiner found that respondent violated § 8(a) (1) of the Act by a policy or practice of asking applicants for employment whether they belonged to a union.

The finding rests upon an equivocal admission by Mrs. Johnson (who did no interviewing herself) that applicants for jobs were "sometimes" asked whether they were union members. She also testified that as a matter of company policy union and non-union operators were hired indiscriminately.

Bonventre flatly denied that it was the policy to ask questions about union membership. He admitted that "sometimes" the fact came out in the course of his interviews with cutters, but this was not at all surprising since almost all cutters (of whom there were only three in the plant) were union members.

Bonventre testified that no applicant had ever been turned down because of union membership and there is not a shred of evidence to the contrary. Nor is there any evidence that anyone was asked to relinquish union membership after being hired or threatened with retaliation because of such membership.

The examiner evidently disbelieved Bonventre's denial that there was a policy of interrogation. From this he apparently concluded that though there was no such "policy" there was such a "practice."

■ Despite the weight accorded to a finding of the incredibility of a witness by the trier of the facts, going even to the extent of holding that he may, under some circumstances, assume the truth of what the witness denies, see Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952), cited in N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962), we cannot agree that under the circumstances of this case, such an assumption alone would satisfy the General Counsel's burden of proof. Nor can the denial of a "policy" of interrogation be turned into an admission that there was a "practice" of interrogation as the examiner apparently thought. The record gives no support to such a conclusion.

■ We have refused enforcement of an order against interrogation of employees found to be in violation of § 8(a) (1) where far more than this was shown. Bourne v. N. L. R. B., 332 F.2d 47, 48 (2 Cir. 1964); N. L. R. B. v. Lorben Corp., 345 F.2d 346 (2 Cir. 1965).

In the Bourne case we said (332 F.2d p. 48):

> "Under our decisions interrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards. * * *"

These include a background of employer discrimination and demonstration that the circumstances of interrogation would induce fear of reprisal. See also Beaver Valley Canning Co. v. N. L. R. B., 332 F.2d 429, 433 (8 Cir. 1964); S. H. Kress & Co. v. N. L. R. B., 317 F.2d 225, 228 (9 Cir. 1963); N. L. R. B. v. Syracuse Color Press, Inc., 209 F.2d 596, 599 (2 Cir. 1954); N. L. R. B. v. Tennessee Coach Co., 191 F.2d 546, 555 (6 Cir. 1951). There is no such evidence here.

No background of employer discrimination was shown unless it can be retroactively inferred from the events of the June 7 weekend. While those events, taken with other evidence, may give rise to a permissible inference that the discharges immediately following were discriminatory, it cannot reasonably be inferred from them that a preceding policy or practice of discrimination was pursued. Direct evidence to that effect is wholly lacking, and, as far as this record

goes, the only evidence is to the contrary.

This finding of employer violation could only be arrived at by straining at a gnat. The record is devoid of evidence to support it.

The order of the Board is modified by striking paragraph 1(c) which reads "Interrogating any applicants for employment on the subject of whether they belong to or are sympathetic to the aims of or intend to join in labor organization." Enforcement of the order as thus modified is granted.