382 F.2d 577
 DAYCO CORPORATION, and its wholly owned subsidiary Howell
Plastics Company, and Cadillac Plastic and Chemical Company,
a division of Dayco Corporation and the successor to Howell
Plastics Company, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 17202.
 United States Court of Appeals Sixth Circuit.
 Aug. 7, 1967, As Amended on Denial of Rehearing Oct. 19, 1967.
 
 Earl R. Boonstra and Donald S. Young, of Dykema, Wheat, Spencer, Goodnow & Trigg, Detroit, Mich., for petitioner.
 Marcus W. Sisk, Atty., National Labor Relations Board, Washington, D.C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Attys., National Labor Relations Board, Washington, D.C., on the brief.
 Before PECK and McCREE, Circuit Judges, and CECIL, Senior Circuit judge.
 CECIL, Senior Circuit Judge.
 
 
 1
 This cause is before us upon petition to review and set aside an order of the National Labor Relations Board issued against petitioner on April 5, 1966. Section 160(f), Title 29, U.S.C. The Board cross-petitions for enforcement of its Order. This Court has jurisdiction of the proceeding, the alleged unfair labor practices having occurred in Howell, Michigan, within this judicial circuit. Section 160(e), Title 29, U.S.C.
 
 
 2
 Cadillac Plastics and Chemical Company, a Michigan Corporation and division of Dayco Corporation, succeeded Howell Plastics Company, a wholly owned subsidiary of Dayco Corporation, in June, 1965, in the operation of a plant in Howell, Michigan, engaged in the manufacture and sale of plastic film. It is undisputed that Dayco and Cadillac, and Dayco and Howell are affiliated businesses and joint employers. These parties will hereafter be collectively referred to as petitioner.
 
 
 3
 On October 20, 1964, the petitioner received a letter from Local Union 580, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Ind., hereafter referred to as the union, in which the union, claiming that it had signed authorization cards from 31 of petitioner's 60 employees, demanded that the petitioner recognize and bargain with it. By letter of October 21, 1964, the petitioner refused to recognize the union and called for a Board election. On December 2, 1964, the Regional Director ordered an election which was held on January 21, 1965. The union lost the election. Upon charges filed by the union, after a hearing before a hearing examiner, the Board set aside the election and found that the petitioner committed unfair labor practices in violation of Section 158(a)(1), Title 29, U.S.C., by engaging in certain coercive conduct prior to the election, and in violation of Section 158(a)(1) and (5) by refusing to recognize and bargain with the union. The Board's Decision and Order are reported at 157 NLRB No. 117.
 
 
 4
 Seven employees stated that one to two weeks prior to the election, shift supervisor Benjamin Gray questioned them about their opinion of the union and told them that he thought the petitioner would grant a wage increase if the union lost the election. According to two of these employees, Gray showed them a list containing the names of employees who he said were going to vote for the union in the coming election. Gray indicated to two other employees that such a list existed. Gray could not recall most of these conversations. He did state that he heard rumors of a wage increase, and when questioned about it by employees, he responded that he did not know whether there would be one or not. He denied telling anyone about such an increase. Crediting the testimony of the employees, the Board affirmed the examiner's finding 'that by interrogating employees about their union desires * * *; by creating the impression of surveillance of the employees' union activities; and by promising employees a wage increase in order to dissuade them from voting for the Union, (petitioner) interferred with, restrained, and coerced employees in violation of Section 8(a)(1) of the Act.' We find that there was substantial evidence to support these findings of the Board. Section 160(e), Title 29, U.S.C.
 
 
 5
 The Board also found that a statement in a letter dated January 15, 1965, from Plant Superintendent Jack Tomsick to all employees, that management is 'most anxious and ready to reward a successful effort' in violation a successful effort' was a 'not very of Section 158(a)(1), Title 29, U.S.C. A single sentence contained in a letter or speech of an employer, cannot be considered apart from the entire statement and background in which it was made. N.L.R.B. v. Herman Wilson Lumber Company, 355 F.2d 426 (C.A. 8); N.L.R.B. v. D'Armigene, Inc., 353 F.2d 406 (C.A. 2).
 
 
 6
 Approximately two years before the election, petitioner began its operations at Howell, Michigan. From its inception to the time of the election, petitioner was operating at a loss and at less than production capacity. Tomsick's letter containing the statement labeled as a 'promise of reward' by the Board was one of four sent by petitioner's top management to all employees. On January 7, 1965, George Carlyon, Manufacturing Vice President, in a letter to all employees, stated the petitioner's opposition to the union. He emphasized the serious financial and production difficulties besetting the company, expressed his appreciation to the employees for their past efforts, and indicated that, with time, the problems will be solved. On January 12, 1965, Aldo Galvi, General Manager, wrote a letter to all employees, again reiterating the financial and production predicaments of the company. He pointed out several benefits granted by petitioner and indicated that plans were being undertaken to further improve the situation. He stated that 'our future can best be improved through both your individual and our collective company efforts.' He urged the employees to vote against the union.
 
 
 7
 The letter which formed the basis of the Board's finding of an unfair labor practice, was written to all employees on January 15, 1965, by Jack Tomsick, Plant Superintendent. The letter states that the employees face a very serious choice in the coming election. He says, in part:
 
 
 8
 'I think perhaps I have been closest to you and the situation which has plagued us during this past year and a half. I know we will have more of these problems, but I feel we are over the 'hump', and with your continued help and cooperation we should soon be operating a successful plant.
 
 
 9
 'Our top management has been very patient and understanding, considering the tremendous amount of money they have spent making changes and additions which we felt necessary to reduce our heavy losses. I feel they are most anxious and ready to reward a successful effort and that we owe them a vote of confidence for their efforts and to re-affirm their faith in Howell Plastics.'
 
 
 10
 Tomsick further states that strikes are costly to employees, that unionization can lead to management treating all employees equally, regardless of ability or merit, and that union interference in management affairs have caused other businesses to move or be abandoned. He urged that employees 'continue to place (their) trust in (management) and vote against the union in the coming election. Remember, only if you and we work closely together can we get our company on the road.'
 
 
 11
 The final letter, dated January 18, 1965, was sent to all employees by Richard J. Jacob, President. Mr. Jacob reviewed the petitioner's attempts to make the operation successful, and noted the possibility for success within six months to a year.
 
 
 12
 'It is only when these developments occur that we can consider some of the things that have been planned from the beginning. Obviously these must include normal wage and fringe improvements.
 
 
 13
 'We have great faith in Howell Plastics. We have great faith in all of you. You must in turn have faith in this operation and have faith in the fact that we will grant over a period of time whatever is possible in the way of wage and fringe benefits with or without a union. * * * There are two sides to union organization-- one, is a lot of promises, second, the fact unions forget to note, is that the success of the company determines the amount and nature of wage, fringe and working condition improvements. It has always been our firm policy to the extent this company is capable, and to the extent that your work and our work proves successful, wages and fringe benefits will be improved in accordance with all of the normal patterns in existence in this industry. We pledge to do this whether there is a union or not.
 
 
 14
 'Let's do this together without outside interference and determined that we can produce a product which customers will buy and which will bring to you job security, improved wages, fringes and working conditions and most of all steady employment.'
 
 
 15
 For these reasons, he concluded, it was in the best interests of the employees to vote against the union.
 
 
 16
 The gist of this series of four letters is that successful operation of the plant, rather than unionization, is the key to improved employee benefits. Petitioner was struggling to develop a profitable operation, and that when this was achieved, it would be in a better position to grant additional benefits. And when they were successful, the benefits would result 'with or without a union.' Petitioner urged its employees to work together with it, without outside interference, to make this operation successful.
 
 
 17
 The Board excerpted one portion of one sentence from Tomsick's letter of January 15, 1965, and found that it contained 'a not very subtle promise of reward.' But reading the entire letter and reading it in relation to the other letters and in the context of petitioner's financial and production difficulties, this finding is not supported by substantial evidence. Section 160(e), Title 29, U.S.C. The test is whether it was reasonably foreseeable that the words of the letter would have an adverse effect on the employees. Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432 (C.A. 8), cert. den. 384 U.S. 1002; N.L.R.B. v. D'Armigene, Inc., supra. Rather than promising the employees any benefits in return for a rejection of the union, the sentence pin-pointed by the Board was in accord with petitioner's appeal that the benefits desired by employees could only be granted when its operation was successful. Petitioner argued to employees that success could best be achieved without union interference, but that once the operation turned a profit, employee benefits would result with or without a union.
 
 
 18
 We find that there is no substantial evidence to support the Board's finding that Tomsick's letter of July 15, 1965, contained a promise of reward in violation of Section 158(a)(1), Title 29, U.S.C.
 
 
 19
 The next issue to be discussed concerns the Board's finding that petitioner committed an unfair labor practice in refusing to recognize and bargain with the union. To support this finding, it is necessary that on October 20, 1964, the date of the union's request, the union possess valid authorization cards from a majority of petitioner's employees. The Board found that the union had valid authorization cards from 31 of petitioner's 60 employees, a majority of one. The union authorization cards were in the following from:
 
 
 20
 'AUTHORIZATION FOR REPRESENTATION
 
 
 21
 'I, the undersigned, employed by .................... believing
 
 
 22
 (Name of Firm)
 
 
 23
 that the working conditions of all employees may best be improved through organization, hereby authorize Local Union No. 580 to represent me and, in my behalf, to hold elections, negotiate all agreements as to hours of labor, wages and other employment conditions.
 
 
 24
 'It being further understood, that my name on this Authorization Card shall, at all times be held strictly confidential.
 
 
 25
 'Department .................... Date
 
 
 26
 ..................
 
 
 27
 'Signature
 
 
 28
 ........................................e o
 
 
 29
 'Address .................... Phone
 
 
 30
 ..................
 
 
 31
 This type of card is known as a dual purpose card and authorizes the union to act as the collective bargaining representative of the employee and to hold elections.
 
 
 32
 The majority of cards were solicited by Austin Opper, who at the time was an employee of petitioner. He testified that he received the cards from Ken Drouin, President of the Local Union, who told him that if he got a majority of employees to sign cards, there would be an election. Opper could not remember how many employees he made a similar statement to, but he said that since there had been considerable discussion in the plant about organizing a union before he obtained the cards, it was usually only necessary to inform a particular employee that he now had the cards and the employee would then sign without further discussion. Opper found it difficult to remember what he said to employees as he solicited their signatures. Opper testified that he told some employees that he needed their signatures to get a majority of cards 'in order to get an election.' He believed that 'we had to get the cards first to be represented' and an election 'didn't come before being represented.' The testimony does not indicate whether he expressed those views to the other employees. Opper admitted that he told employee Jack Frost that he needed his signature to 'get the majority of the votes' and told employee Ron Sober that he needed his signature to get a majority of cards 'in order to have an election, so that the Union could represent us.' Employee Richard Wagner stated that when Opper handed him a card Opper told him that 'we would have to have an election.'
 
 
 33
 The Board affirmed the hearing examiner's finding that the 'solicitors of the cards did not represent that they were to be used only to secure an election, and that there is no evidence of any significance to negative the overt action of the employees of having signed cards designating the Union as bargaining agent. None of the cards, accordingly, are invalidated because of misrepresentations with respect to a possible election.' The Board held that what Opper admitted having told employees in the course of soliciting their signatures did not amount to misrepresentation justifying invalidating the cards. We disagree.
 
 
 34
 The test to be applied to determine the validity of authorization cards is whether the union misrepresented to employees that their sole purpose was to obtain an election. N.L.R.B. v. Cumberland Shoe Corporation, 351 F.2d 917 (C.A. 6). Such misrepresentation invalidates the authorization card. This same test is to be applied where the card also authorizes the holding of an election. N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (C.A. 6), cert. den. 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74. The following quotation from Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732, 743 (C.A.D.C.), cert. den. 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350, was cited with approval by this Court in the Winn-Dixie case.
 
 
 35
 "An employee's thoughts (or afterthoughts) as to why he signed a union card, and what he thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent."
 
 
 36
 But even if the cards contain language specifically authorizing representation, the designations are invalid where the union has obtained them by misrepresenting to employees that their sole purpose is to obtain a Board supervised election. N.L.R.B. v. Koehler, 328 F.2d 770 (C.A. 7).
 
 
 37
 In determining whether authorization cards were secured by union misrepresentation 'the decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the language set forth in the cards.' N.L.R.B. v. Winn-Dixie Stores, Inc., supra, 341 F.2d at p. 754. A card, making no mention of an election, but only authorizing the union to act as bargaining representative, is a clear and explicit affirmation of the fact that the card can be used to secure recognition without an election. But where the card itself makes plain that one of its purposes is to secure an election, greater caution should be used to avoid solicitation which by express words or implication advises the employee that the only purpose of the card is to secure an election. In such cases what the union does not say becomes as important as what the union does say. Amalgamated Clothing Workers of America v. N.L.R.B., 365 F.2d 898 (C.A.D.C.) To invalidate authorization cards relating solely to union representation, it is necessary that there be affirmative misrepresentation that the sole and only purpose of the card is to secure an election. N.L.R.B. v. Cumberland Shoe Corporation, supra. Failure to inform employees that the authorization cards can result in recognition without an election, takes on greater significance where the cards indicate that an election is one of its purposes. To validate such cards, the representations made to employees should reflect their dual purpose of securing representation with or without an election. This Court in N.L.R.B. v. Winn-Dixie Stores, Inc., supra, upheld the Board's determination that the dual purpose cards were valid because the representations made by the solicitors "clearly reflect and corroborate the purpose of the cards as printed thereon."
 
 
 38
 In the present case the union claimed that it had a majority of signed dual purpose cards by only one card. The chief solicitor of these cards was told by the president of the union that if a majority of petitioner's employees signed cards there would be an election. Opper further testified that he told some employees that their signatures were necessary 'in order to get an election.' Opper admitted telling one employee that his signature was needed 'in order to have an election, so that the Union could represent us.' Another employee testified that when Opper handed him a card Opper said that 'we would have to have an election.' By Opper's own admissions, he indicated to several employees that the cards were necessary to secure an election. Although there is testimony that Opper believed that 'we had to get the cards first to be represented,' Opper seems very confused as to what he meant by 'represented.' At any rate, he did not testify that this belief, albeit confused, was conveyed to the other employees. Opper stated that he generally handed a card to an employee who would usually sign it without much discussion.
 
 
 39
 By emphasizing that the cards were necessary in order to secure a Board supervised election, Opper misled employees into signing authorization cards under a mistaken belief as to their true import. Where the union has engaged in such misrepresentation, cards so obtained are not necessarily a valid designation of a collective bargaining representative. Bauer Welding and Metal Fabricators, Inc. v. N.L.R.B., 358 F.2d 766 (C.A. 8). This is especially true when the cards themselves include the holding of an election as one of its purposes. The union should make it explicitly clear to employees that they are signing a dual purpose card, and should not, in their solicitations, ignore the fact that the cards themselves can form the basis for recognition. Since we find that the union actively misrepresented the purpose of the cards, the case of N.L.R.B. v. Peterson Brothers, Inc., 342 F.2d 221, in which the Fifth Circuit considered the subjective intent of the signatories of dual purpose cards is not applicable to the case before us. It is appropriate, however, to quote the following from that Court's opinion:
 
 
 40
 'It would be very simple for the union to prepare a card that in an unambiguous form would authorize union representation as a bargaining agent. If the union also wished to have cards signed to call an election this would also be a very simple matter. There can be little excuse for combining the two in a card that makes possible the misrepresentation that the Board found to have existed in the case of McElveen and the misunderstanding that the examiner found as to three other employees and which we now find as to four employees.'
 
 
 41
 Viewing the evidence as a whole, we conclude that there was not substantial evidence to support the Board's finding that all thirty-one authorization cards possessed by the union were valid. Inasmuch as we hold that the union lacked a majority of valid cards, it is unnecessary to consider whether the petitioner's refusal to bargain was in good faith.
 
 
 42
 Enforcement of the Board's order is granted as to the 8(a)(1) violation concerning the coercive conduct of shift supervisor, Benjamin Gray, and denied as to the portions finding an 8(a)(1) violation in the letter of January 15, 1965, written by Jack Tomsick, Plant Superintendent, and the finding of 8(a)(1) and (5) violations by the alleged refusal of petitioner to recognize and bargain with the union.