NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SWAN SUPER CLEANERS, INC.,
Respondent.

No. 16952.

United States Court of Appeals
Sixth Circuit.

Oct. 25, 1967.

Vivian Asplund, Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., N.L.R.B., Washington, D. C., on the brief), for petitioner.

Winthrop A. Johns, Washington, D. C. (Gerard D. Reilly, Washington, D. C., John J. Chester, Columbus, Ohio, on the brief; Reilly & Wells, Washington, D. C., Chester & Rose, Charles D. Minor, Vorys, Sater, Seymour & Pease, Columbus, Ohio, of counsel), for respondent.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

We consider the National Labor Relations Board's petition to enforce its order against respondent Swan Super Cleaners, Inc. In its Decision and Order, reported as Swan Super Cleaners, Inc., 152 N.L.R.B. 163 (1965), the Board found that respondent, a laundry and dry cleaning plant, had violated the National Labor Relations Act (29 U.S.C. § 158(a) (1), (3) and (5)); first, by coercive interrogation, threat of reprisal, and promises of benefits, in resisting a 1963 union[1] organizing campaign; second, by discriminatory discharge of an employee; and third, by refusal to bargain with the union without good

---

1. Amalgamated Clothing Workers of America, AFL-CIO.

faith doubt of the union's assertion that it had signed up a majority of respondent's employees. We deny enforcement of the Board's order as to its finding of discriminatory discharge and refusal to bargain, but enforce its order relating to the § 8(a) (1) violation.

### 1) Illegal resistance to union campaign. § 8(a) (1).

■ The union's organizing campaign began early in 1963. After learning of it, the company resisted. There was evidence from which it could be found that by interrogation, threats, and promise of benefits, the respondent violated the Act. The Board's Decision and Order with its Trial Examiner's Decision, reported at 152 N.L.R.B. 163, adequately sets out the evidence offered to support and resist the § 8(a) (1) charge; it shows the usual pattern of company and union conduct characteristic of such campaigns. The trial examiner, affirmed by the Board, resolved factual issues against the company by crediting the General Counsel's witnesses and drawing inferences from the testimony. We are bound by such findings of fact because we cannot say they are without support by substantial evidence in the record. § 10(e) of the Act, 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It would not be informative to the litigants or of any precedential importance for us to review the facts and repeat well-known principles controlling the fact-finding functions of the Board.

### 2) Alleged discriminatory discharge. § 8(a) (3).

An employee, Sonjia Wade, was discharged on April 29, 1963. The trial examiner held that her discharge was not in violation of § 8(a) (3) and dismissed the charge. The Board reversed the examiner. As part of her work, she operated a so-called "touchup" press to finish ironing shirts that could not be handled on other equipment in the laundry. In disagreement with supervision, Wade asserted that she could not iron certain kinds of shirts on her machine; her supervisor contended that it could be done and essayed to show her how. There was evidence that while he was attempting to show her how to do the work, Wade ignored him, folded her arms, and looked out the window, thus exhibiting an insubordinate and contemptuous attitude. For this, she was discharged; and there was evidence of previous insubordination on her part. Although she denied the previous insubordination, Wade's account of her conduct on the morning she was discharged cannot be read as a denial of her impudence, which was witnessed not only by her supervisor, but by another employee. She testifies as follows:

"So, I kept on working that day. And so I was over on the press, helping to press up, and Mr. Johnson came over there, and he says, 'I am sorry to do this, Sonjia.' And I said, 'Do what, Mr. Johnson?' and he says, 'Let you go.' And I said, 'Okay.' He said, 'Because this morning when I showed you how to do that shirt, you acted like you didn't want to do it.'

\* \* \* \* \* \*

"He said that I was, I didn't pay no attention to him—not that I didn't pay any attention to him, but that he was sorry he had to let me go. And I said, 'Okay.' And he said that I didn't pay no attention to him, that I was uncooperative, and that is all that was said, and I just went in to the rest room and changed my clothes, and left."

It is unclear whether the trial examiner accepted the company's account of Wade's discharge. He disposed of the matter as follows:

"There is no evidence in the record to support the allegation in the complaint that Sonjia Wade was discharged in violation of the Act. The complaint in that respect should be dismissed."

■ The Board, however, found that the company's avowed reason for Wade's discharge was a pretext and that she

was released because of her interest and activity in behalf of the union. This finding is without support.

There was evidence that, prior to her discharge on April 29, Sonjia Wade had signed an authorization card for the union, had allowed a union meeting, attended by eight or nine employees, to be held in her home, and had distributed and obtained signatures on five or six union cards. However, there is no evidence that respondent or any of its executives or supervisors knew of Wade's above activity. She was not known to them as a union protagonist unless such knowledge can be inferred. All of the evidence, except for a doubtful statement of one Hall, was to the effect that the respondent company's earliest knowledge of union activity came on May 3, 1963, when management found some union pamphlets that were being distributed. Sonjia Wade had been discharged prior to that date.

The allegedly coercive conduct upon which the Board relied for finding violation of § 8(a) (1) occurred after that date. One Lillian Hall, however, testified that on April 24—five days before Wade's discharge on April 29—a supervisor asked her whether she (the witness Hall) had attended a union meeting on the previous night. From this, the Board infers that the respondent company knew of the union campaign prior to Wade's discharge on April 29. Then, by some quite long, inferential steps, it concludes that the company must have known of Wade's union activity, and therefore, contrary to all the testimony, that her discharge was motivated by a company desire to get rid of a union activist.

While it is not of controlling importance, the probative worth of the witness Hall's fixing of April 24 as the date of the company's critical inquiry concerning the union meeting is indeed thin. The following is her first fixing of this date, clearly placing the inquiry after Wade's discharge on April 29th.

"Q. Now, Miss Lillia, have you ever had any conversation with any supervisor or boss at the plant regarding the Union *since* this meeting? [a meeting of May 7, 1963] (Emphasis supplied.)

"A. Yes, I have.

\* \* \* \* \* \*

"Q. Do you remember when it took place, what month it was in?

"A. It was in May, I remember that. It was in May, because I remember the last—the fourth Tuesday in May I always go to the Eastern Star meeting, and it was the next day after that."

■ She thereafter moved the date of the inquiry into April. But even if the reported conversation between Johnson (a supervisor) and Hall took place on April 24, that fact does not provide a permissible basis for inferring that the company thereby became aware of *Wade's* activities. The meeting talked of was not a meeting at Wade's house and there is no evidence that she even attended such meeting. It should be observed that other than the witness Hall's account, there is no evidence from the General Counsel's witnesses or from those offered by respondent that before May 3rd the latter had any knowledge of union activity by *anyone*. Neither Wade nor any other witness claimed that the company knew of, and in discharging Wade was motivated by, her union adherence.

■ The incidents of coercive interrogation and union surveillance, referred to by the Board, which began in the middle of May, cannot be related back to demonstrate that on April 29th respondent's supervisory personnel must have known of Wade's union sympathies. The Board indeed has the right to draw inferences of fact and from there move on to infer, in proper circumstances, the discriminatory purpose necessary to strike down a particular discharge. NLRB v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368, 378 (1941); NLRB v. Power Equipment Co., 313 F.2d 438, 441 (C.A.6, 1963); NLRB v. Bendix Corp., 299 F.2d 308, 310 (C.A.

6, 1962), cert. den. 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65. But we still have the duty to consider whether there is substantial evidence to support such inference. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). And this meager testimony that one minor supervisor asked Hall about a meeting does not prove, or permit the inference, that such supervisor knew of the activities of Wade. Rivers Manufacturing Corp. v. NLRB, 376 F.2d 511, 515 (1967). The burden of proof was on the Board's general counsel to prove that some part of the company's motivation was discriminatory. NLRB v. Murray Ohio Manufacturing Co., 326 F.2d 509, 513 (C.A.6, 1964); NLRB v. Cleveland Trust Co., 214 F.2d 95, 99 (C.A.6, 1954). Even if the company knew that Sonjia Wade was a union activist, such knowledge by the company would not insulate her from being discharged for a nondiscriminatory, good cause. Lawson Milk Co., v. NLRB, 317 F.2d 756, 760 (C.A.6, 1963). Such discriminatory motive cannot reside entirely in a Board view that the discharge was without sufficient cause. NLRB v. Mylan-Sparta, 166 F.2d 485, 490, 491 (C.A.6, 1948); NLRB v. Houston Chronicle Pub. Co., 211 F.2d 848, 854 (C.A.5, 1954); NLRB v. Wagner Iron Works, 220 F.2d 126, 133 (C.A. 7, 1955).

3) Refusal to bargain. § 8(a) (5).

On May 15, 1963, the union sent a telegram to Gelpi, president of respondent, asserting that it represented a majority of respondent's workers, demanding recognition as the employees' bargaining agent, and requesting a conference to negotiate a collective bargaining agreement. The telegram further advised that if the company had doubts of the union's claims, the union was prepared to submit to a card check by an impartial, mutually agreeable person. It requested a reply.

President Gelpi testified that after receiving the telegram he called his lawyer who told him to "just sit tight" and a union representative would either visit him or the union would petition for an election. Neither of those things occurred; Gelpi did not respond to the telegram or ever express to the union any doubt of its majority status. No other contacts were made between the company and the union and on June 1, the union filed its charge with the NLRB's Regional Director that the company had refused to bargain, in violation of § 8(a) (5) of the Act.

Respondent company defended its conduct, first, by claim that the union failed to establish that a majority of the employees in the plant supported it; and second, that Gelpi's "wait-and-see" attitude after receipt of the telegram was not an illegal refusal to bargain.

#### The union's majority status.

The trial examiner found that 35 of 65 eligible plant employees had signed cards authorizing the union to represent them. By finding that two employees were supervisors, he rejected the company's claim that the proper bargaining unit consisted of 67 workers; he also rejected its claim that seven cards were void because union solicitors had represented to the signers that the cards were to be used to obtain a Board supervised election, and did not authorize the union to act as bargaining agent for the signers.

#### Size of bargaining unit.

Contrary to respondent's contention, the trial examiner regarded two of its employees, Isler and Johnston, as "supervisors" within the meaning of § 2(11) of the Act, 29 U.S.C.A. § 152(11), and thus ineligible for inclusion in the bargaining unit. Without setting out the relevant proofs, we are satisfied that they permitted the trial examiner's finding in this regard. We have said that whether an employee is a supervisor is a question of fact, "and the Board's resolution of the issue is conclusive if supported by substantial evidence." Peoples Service Drug Store, Inc. v. NLRB, 375 F.2d 551, 554 (C.A.6, 1967); NLRB v. Ertel Manufacturing Corp.,

352 F.2d 916, 918 (C.A.7, 1965); cert. den. 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed. 2d 208; see also Eastern Greyhound Lines v. NLRB, 337 F.2d 84 (C.A.6, 1964). Such evidence to support the Board's finding is present here.

Did the union have a majority?

 The union needed 33 adherents to constitute a majority of the 65 employees in the bargaining unit. The trial examiner and the Board found that the union had 35 validly signed membership cards. If three of such cards should not have been counted, the union did not have a majority. Respondent contends that 7 of the cards should not have been counted; it asserts that these cards were the product of fraudulent importuning by union agents which led the signers to believe that the holding of an election would be the only consequence of their signing. The representations made in the solicitations of all seven of the challenged cards raise serious doubts that they evidence a genuine desire to join the union. But, obedient to our decisions in NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (C.A.6, 1965), and NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (C.A.6, 1965), cert. den. 382 U.S. 380, 86 S.Ct. 69, 15 L.Ed.2d 74, we limit our consideration to those which the evidence shows were the product of the signers' belief that they were to be used only to obtain an election. So tested, we find 4 of them invalid, thus destroying the majority claimed by the union.

Three of these invalid cards, as were others, were solicited by two men, one not otherwise identified than as "a preacher" and the other an employee of the involved union—Chester Makoski. The fourth card was obtained by another union solicitor, Charles P. Garrish, and the preacher. We set out the testimony given by the signers of these four cards as to what they were told was the purpose of the cards they signed.

*Shirley Green*

"Q. What did he say to you about the union?

A. He told me that there would be a vote for the Union, they would vote it in, there would be an election, he would let me know, and that was all.

\* \* \* \* \* \*

Q. Did he say anything about joining the Union?

A. No, he said he was trying to get it organized. They hadn't got it together yet, *these cards didn't mean anything*, they were just trying to get it together, *that there* would be a vote on it. (Emphasis supplied.)

\* \* \* \* \* \*

Q. Now, when you signed the card, did you intend to have the Union speak for you?

A. No. I did not."

*Clara Anna Hall.*

"Q. What did he say?

A. He was telling me about the Union, but I can't remember all that he said, but he told me there would be voting on the Union, there would be a machine set up and no one would know how I voted but them, and when I signed the card, no one would see the card but them, and how I voted.

\* \* \* \* \* \*

Q. What else did he say?

A. That is all I can remember. At the time I was busy. He was talking about it. I had signed the card, because he said there would be voting set up by a machine and no one would know how I signed but him—but them—and no one would see the vote.

\* \* \* \* \* \*

Q. Now, when you signed the card, did you intend to have the Union speak for you?

A. No, I did not.

Q. Did you read this card when you signed it?

A. No, the only thing—I didn't read the card. The only thing I signed my name and address. I didn't pay no attention to what color the card was. All I know is it was a card."

*Viola Scroggins.*

"A. * * * My husband had a piece of paper, reading it, and he was discussing the Union; and I told him that I didn't want no part of the Union because the Union couldn't do nothing for me. He replied to me, why a Union couldn't do nothing for you. I told him because, I said, 'I have all of the rights that the Union was offering. We were already given those rights.'

* * * * * *

A. * * * He [the Union solicitor] asked me if I would mind signing the card to help out the—it wasn't the Union—they were *only* trying to see how many they could to campaign for a Union, then there would be a registered vote and all for a Union, that the thing he had wasn't a Union, he was just going around seeing how many he could get for a Union, representatives for the Union. * * * He replied to me, he said, 'You can sign it if you want to, because it is not a Union.' that is what my husband said.

Trial Examiner: That is what who said?

The witness: My husband said I could sign it if I wanted to because I wasn't signing up for no Union.

By Mr. Chester: Was your husband present right there with Mr. Makoski [union solicitor]?

A. Yes.

Q. Mr. Makoski was present right there when this was said by your husband?

A. Yes.

Q. What did Mr. Makoski reply to this?

A. He didn't say anything then, because my husband replied to him that he was in a Union, he was a Union Secretary or something, he knowed all about the Union.

* * * * * *

Q. Did Mr. Makoski say anything about your signing the card, being a joining of the Union?

A. Yes, he said it wasn't joining the Union, that they were campaigning.

* * * * * *

Q. Did Mr. Makoski say that he had been trying to get Swan's for fourteen years?

A. * * * He said he was going to get them this time if he had to go through Court, and our names wouldn't be brought up if we signed cards, although we weren't joining no Union, not until we pay our fees and all, and we weren't under no obligation.

Q. When you signed General Counsel's Exhibit 15, did you intend to have the Union speak for you?

A. No.

Q. Did you intend to join the Union?

A. No, because I told them in the beginning there was nothing they could do for me."

*Ruth Howard.*

"Q. Would you state what took place—would you so state when and where you signed the card?

A. Well, it was around in February, I think, and it was in the evening and I was at home, and two representatives of the union came by and asked if they could speak to me and my sister at that time.

* * * * * *

He first stated the different things the union would offer us girls, he asked us if we had heard about it, and we said yes, we had heard about it, so he asked us if we wanted to sign it, and we told him no, we didn't. And so he said he was trying to get a percentage of the girls to sign the cards so they could come in and vote for the union and I said, 'I'm not sure, I'm undecided.' I said, 'Would I have a chance to change my mind,' and he said, 'Yes,' and so I signed.

Q. When you signed, did you intend to become a member of the Union?

A. No.

\* \* \* \* \* \*

Q. When you signed the card, did you read the card?

A. Yes.

Q. What happened after that?

A. After I signed the card?

Q. Yes.

A. Well, right before I signed, I said, 'If I don't want anything to do with this, what would happen? He said, 'You will have time to think and vote,' so I said, 'Okay.' I said, 'I'll sign.' So they got the cards together and left.

\* \* \* \* \* \*

Q. At the time that you signed the card, was there anything said about taking these cards to Mr. Gelpi [President of Swan Super Cleaners]?

A. Yes.

Q. Would you state what was said, who said it and where, and what was said?

A. Well, this preacher said that when they got the percent of cards that they needed, that they would take them to a priest, and the priest would take them to Mr. Gelpi and show that they had a percentage to come into the laundry and vote.

\* \* \* \* \* \*

Q. Did he say he would take the cards and show them to Mr. Gelpi, and if we have enough, that the union would be in?

A. No, he said they would come and vote at the laundry."

We at once make clear that we do not consider testimony of a subjective intention not to join the union as of controlling importance. See Joy Silk Mills v. NLRB, 185 F.2d 732, 743 (C.A. D.C. 1950) cert. den. 341 U.S. 914, 71

S.Ct. 734, 95 L.Ed. 1350. But it is relevant in assessing the effect of the solicitor's words, for it casts a telling reflection on the actual communication conveyed to the signer. The testimony of the signer as to his *expressed* state of mind is also relevant in determining whether his misapprehension over the purpose of the card was *knowingly induced* by the solicitor. Such inducement of an employee who openly expresses an intention not to join the union suggests that representations concerning an election were intended to lead to a belief that the only purpose of the card was to hold an election. In NLRB v. Winn-Dixie Stores, Inc., supra, we said:

"The decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the language set forth in the cards. If in fact misrepresentations are made by the union to employees *to the effect* that the only purpose of the card is to authorize the union to petition the Board for an election, the card will not be construed to authorize representation, even though it contains language to that effect. N. L. R. B. v. Koehler, 328 F.2d 770 (C.A. 7); Englewood Lumber Company, 130 N.L.R.B. 394." 341 F.2d at 754. (Emphasis supplied.)

We emphasize that the "preacher" who was present at the solicitations of the cards was not produced at the hearing; Chester Makoski was present but did not question the accuracy of the account of his representations given by the three signers solicited by him. Nor did Charles P. Garrish testify specifically as to his representations concerning any one card; he did testify as to his solicitations in general.[2] We read the trial examiner's

---

2. In the case of Ruth Howard, whose card was solicited by Garrish, his testimony about his solicitations in general would seem to contradict her account. But the Trial Examiner does not refer to Garrish's testimony except for the witnessing of Howard's signature. His summary of her testimony contains no indication that he does not credit it. Garrish testified, in pertinent part, as follows: "Q. Now will you relate what your conversation was with them, at this time? \* \* The Witness: I was attempting to explain the benefits of the Union; that was all I could do, and asked them if they would sign a card. Q. And that was the total sum and substance of the conversation? A. That, and explaining

decision as "crediting" the employees' testimony relevant to the issue here.

We come then to the critical question of whether our invalidating the four cards involved is inconsistent with what we said in *Cumberland* and later in Dayco Corporation v. N. L. R. B., 382 F.2d 577, (Aug. 7, 1967). In *Cumberland* we emphasized that "In no instance did any employee testify that he was told that the election was the *only* purpose of the card." 351 F.2d at 920. In *Dayco* we construed the holding of *Cumberland* as follows:

"To invalidate authorization cards *relating solely to union representation*, it is necessary that there be affirmative misrepresentation that the *sole* and *only* purpose of the card is to secure an election." 382 F.2d 582 (Emphasis supplied.)

But we there held that the cards involved were invalid because of the character of their solicitation.

We think it right now to say that we do not consider that we have announced a rule that only where the solicitor of a card actually employs the specified words "this card is for the *sole* and *only* purpose of having an election" will a card be invalidated. We did not intend such a narrow and mechanical rule. We believe that whatever the style or actual words of the solicitation, if it is clearly calculated to create in the mind of the one solicited a belief that the *only purpose of the card is to obtain an election*, an invalidation of such card does not offend our *Cumberland* rule.

In *Dayco* we were dealing with dual purpose cards, which on their face authorized the union as collective bargaining agent *and to hold elections*. We invalidated the cards because of the following representations:

"Opper testified that he told employees that he needed their signatures to get a majority of cards 'in order to get an election.' * * * Opper admitted that he told employee Jack Frost that he needed his signature to 'get the majority of the votes' and told employee Ron Sober that he needed his signature to get a majority of cards 'in order to have an election, so that the Union could represent us.' Employee Richard Wagner stated that when Opper handed him a card Opper told him that 'we would have to have an election.'

The statements made to Shirley Green and Viola Scroggins clearly amounted to a misrepresentation that the only purpose of the cards was to have an election. This follows from the statement to Green that other than for election, "those cards didn't mean anything," and in the statement to Scroggins that "it wasn't joining the union" after her expressed wish that she did not want to join the union. The testimony by Clara Ann Hall and Ruth Howard does not disclose with equal clarity a representation that obtaining an election was the only purpose of the cards. This is Clara Ann Hall's account of the solicitor's remarks:

"He told me there would be voting on the Union, there would be a machine set up and no one would know how I voted but them, and when I signed the card, no one would see the card but them, and how I voted. He told me at the time there was 20 per cent of the girls had already signed, that is what he said, sat in my living room and told me."

To the above she added, "That is the only reason why I signed the card, because he said there would be voting set up by a machine and no one would know how I signed but him—but them—and no one would see the vote." She also testified that she did not intend to have the union speak for her and that she did not read the card. As to Ruth Howard, she immediately told the solicitor that she didn't wish to sign a card and she was assured

to them the benefits that we would try to get in collective bargaining. Q. And what else? A. Well, that would be about the sum of it. That is all you can do

when you are organizing, explain the benefits you can, or you hope to achieve in collective bargaining with the company."

that "he was trying to get a percentage of the girls to sign the cards so they could come in and vote for the union." She then said she was undecided and asked if she would have a chance to change her mind, and was assured she would. She added that "right before I signed I said, 'If I don't want anything to do with this, what would happen' and he (the solicitor) said 'You will have time to think and vote' so I said, 'Okay * * * I'll sign.'"

None of the foregoing was denied by Makoski and neither did the examiner or the Board impugn its veracity. Considering the *context* of the solicitations, we find that their clear intent and effect was to assure these women that their signing was *only* for the purpose of having an election. The trial examiner remarked that none of these women later expressed a desire to disavow the union. We do not consider that they had such a duty, since we find that their signatures did not amount to an authorization of the union in the first place. They had no chance to vote as they were promised. No election was held; neither did the union seek one. It followed a now popular procedure of filing unfair labor practice charges against the company, having its claim of a bare majority sustained, and thus obtaining bargaining rights without an election.

We find this case further distinguishable from *Cumberland* in the fact that there the union did seek an election and the Board indicated its lack of confidence in the probative worth of the testimony offered to sustain the claim of improper solicitation. In its footnote quoted in *Cumberland*, it said:

"3. The record indicates that the testimony to this effect consisted of affirmative responses by the signatories to leading questions propounded by Respondent's counsel, upon cross-examination, as to whether they were told that the purpose of the cards was to secure an election. We do not deem such testimony sufficient to controvert the statement of the purpose and effect of such cards contained on the

face thereof, nor do we consider it inconsistent with an understanding that the cards served the dual purpose of designating a representative and of securing an election." 351 F.2d at 919. We said, "In our present case we find no claim of outright misrepresentation on the part of any solicitor. * * * In no instance did any employee testify that he was told that the election was the only purpose of the card." 351 F.2d 920. The undenied statement of Makoski here that the cards "did not mean a thing" other than for election and that the signing of the cards "wasn't joining the union" were clear misrepresentations, as against the union's and the NLRB's assertion that the signers voluntarily and knowledgeably joined the union.

In *Winn-Dixie* we affirmed a finding of the Board that,

"[E]xcept for one card, not in issue herein, the record shows that the representations made by the Union's solicitors in order to obtain employee signatures, clearly reflect and corroborate the purpose of the cards as printed thereon. The Trial Examiner's finding that no misrepresentations were made in securing employee signatures is amply supported by the record." 341 F.2d at 754, 755.

In this case no issue was made as to the fact of the misrepresentations but the Trial Examiner found the misrepresentations not sufficient to invalidate the cards because they did not actually contain the words "sole" or "only" purpose, which he construed to be required under the Board's decision in Cumberland Shoe Corporation, 144 NLRB 1268. Illustrative of this approach was his disposition of the Viola Scroggins card:

"Here, as in *Cumberland*, supra, it does not appear that she was told that the only purpose of the cards was to secure an election. *She was told that she was not joining the union* by signing the card and that he was trying to see how many he could get to campaign for the union in its organizational effort." (Emphasis supplied.)

As to Shirley Green, after reading her testimony that she was told that "the cards did not mean anything," he concluded:

> "I find Shirley Green's card to be valid. Nowhere does the record show that she was told that the *only* purpose of the cards was to vote in an election."

It appears that the examiner's position was, and the Board's position now is, that unless the solicitor has actually employed the words "sole" or "only" in his sales talk, our opinion in *Cumberland* insulates the solicitation from condemnation, no matter what its other vices. We do not believe the language employed in *Cumberland* suggests any such mechanical interpretation. The "outright misrepresentation" referred to therein could certainly be accomplished by other words than "sole" or "only." A sophisticated and only modestly talented union agent could easily live with such a narrow rule and, leaving out the *bad words*—"sole" and "only"—employ language clearly calculated to lead a woman laundry worker to believe that the holding of an election was all that she signed up for.

The distinguished author of the Second Circuit's opinion in NLRB v. S. E. Nichols Company, 380 F.2d 438 (C.A.2, 1967), considered that our *Cumberland* and *Winn-Dixie* decisions commit us to the narrow view that cards will not be vitiated unless the words "sole" or "only" are used. We adhere to the rule of those cases and believe that we here do no violence to it by holding that the misrepresentations in this case did, in their total context, persuade the involved signers that they were not joining the union or designating it as their bargaining agent. The Board's contrary finding is without support "by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e).

Without reciting them here, we mention that the representations considered by Judge Friendly in NLRB v. S. E. Nichols, supra, bear substantial similarity to those before us in this case. Referring to one card obtained under such circumstances, Judge Friendly said:

> "It is quite a different matter to permit a union to attain recognition by authorization cards procured on the affirmative assurance that there would be an election without a further clear explanation that the cards can and may also be used to obtain recognition without any subsequent expression of preference by the employees; such a half-truth gives the employees the false impression that they will have an opportunity in all events to register their true preferences in the secrecy of the voting booth. As has been well said, Note, supra, 75 Yale L.J. at 826: 'If the employee thinks the cards will lead to a secret ballot, he can insure himself against the possibility of future retaliation and prevent harassment only by signing. Such an employee may sign a card planning to vote against the union or at least intending to reserve decision until he hears the employer's views or talks to fellow employees.'
>
> "We decline to encourage such an impairment of employees' § 7 rights."

In view of our holding that the disallowance of the four cards under discussion destroyed the union's card majority, we need not consider the issue of "good faith" in the Section 8(a) (5) refusal to bargain charge. NLRB v. Kohler, 328 F. 2d 770, 773 (C.A. 7, 1964); Dayco Corporation v. NLRB, 382 F.2d 577 (C.A. 6, 1967).

Enforcement of the Board's order as to the § 8(a) (1) violation is ordered, and otherwise it is denied enforcement.