**RIVERS MANUFACTURING CORP.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 16825.

United States Court of Appeals
Sixth Circuit.
May 9, 1967.

---

Robert H. Cowan, Nashville, Tenn. (Gracey, Buck, Maddin & Cowan, Nashville, Tenn., on the brief), for petitioner.

Morton Namrow, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before O'SULLIVAN, CELEBREZZE and McCREE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This matter involves a petition for review, and a counter request for enforcement, of a decision of the National Labor Relations Board (reported at 154 NLRB No. 51) finding Rivers Manufacturing Corporation guilty of 8(a) (1) and 8(a) (3) unfair labor practices, 29 U.S.C.A. § 158(a) (1) and (3). The alleged violations related to the discharge of nine employees of Rivers and the interrogation, coercion and illegal persuasion of others —activity meant to discourage union membership. The context of these events was a short-lived and unsuccessful effort of the International Union of Mine, Mill and Smelter Workers (AFL-CIO), to organize the approximately 100 employees of Rivers Manufacturing Corporation of Centerville, Tennessee. We deal only with the discharge of five employees on October 2, 1964, and not with alleged other employer misconduct on and after November 15, 1964, including the seriatim firing of four workers late in November and early in December of that year.

■ We so limit our review because petitioner's brief, with becoming candor and good advocacy, states that,

"It [Rivers Mfg. Corp.] will concede at the outset that reasonable minds might differ on the conclusions based on the record as a whole reached by Respondent for any actions taken by Petitioner after, on or about November 15, 1964, however Petitioner firmly contends that these, perhaps zealous, actions should not be used to condemn its valid terminations on October 2, 1964."

The question, thus, for our decision is whether the Board's finding that Rivers on October 2, 1964, discharged employees Sanders, Haley, Mayberry, Brown and Shelton to discourage membership in a union, was supported "by substantial evidence on the record considered as a whole." § 10(e) and (f) of the Act, 29 U.S.C.A. § 160(e) and (f). We hold that such finding was not so supported, and that the company is not required to reinstate the five dischargees and pay them for any loss of wages they have suffered.

Rivers manufactures plastic and neon signs fashioned from plastic, aluminum, stainless steel, paint and other component materials. Its plant, which employs about 100 people, is at Centerville, Tennessee; R. T. Rivers is its president and principal owner. There is no evi-

dence that prior to November, 1964, the company had any collisions with any union or had ever exhibited an anti-union disposition. The company's explanation of the events leading to the discharges here in issue is as follows:

In the first half of 1964 the company had sustained serious losses and at various meetings of its directors in the summer and early fall of that year, the fact that the company's "finances were in a most critical situation" was discussed. In late September it was decided that the working force would have to be reduced and inefficient workmen replaced. In furtherance of this purpose, a review of the production payroll was made by supervisory personnel, using a list which set out the names of some 86 people, ranked according to their seniority. This list, containing notations thereon as to the skills and usefulness of various employees, was completed just prior to the October 2 discharges. It was received in evidence and its authenticity is not questioned. The names of the five alleged discriminatees were crossed out, as were others, indicative of an intention to lay them off. In the instance of three of the discriminatees, notations were made as to the poor quality of their work. Four of these five had started work in July or August, 1964, and were generally among the most recently hired employees. They were dismissed on October 2, and while no exact figure as to the number of employees laid off at that time was given—one witness said 8 or 10—there are some 14 names stricken from the list. There is no evidence as to whether any of the October 2 dischargees, other than the five here involved, were or were not union adherents. The trial examiner foreclosed inquiry as to this point.

There is no evidence that on or prior to October 2 the Rivers company had knowledge of any union activity in its plant. The Board's inference to the contrary is, in our view, without evidentiary support. There was evidence, however, that commencing on or about November 15 the company became aware of activity by the Mine, Mill and Smelter's union to sign up some of its employees. From this evidence and under the company's concession, we may accept the Board's finding that the company thereafter resisted the union's campaign and by virtue of its interrogation, surveillance and pressuring of various employees, coupled with the firing of some four workers in late November and December of 1964, was guilty of the unfair labor practices charged, relating to such conduct. The union organization activities apparently ended when, either due to voluntary cooperation or coercive inducement, those who had signed up for the union withdrew therefrom.

But, although we affirm the Board as to part of its findings, we cannot let stand the examiner's inference that the company had knowledge of the union's campaign when it discharged the five employees on October 2, and that the discharges, consequently, were made to discourage membership in the union. The total evidence from which this inference was drawn is as follows:

1) The five alleged discriminatees testified that they had on September 23 or 24 signed cards to join the union, and one or more said that they had asked others to sign. None claimed to have disclosed this in any way to any supervisory personnel.

2) One of the alleged discriminatees, William Mayberry, was employed by the company on August 7, 1964. He had previously been employed by a company called Tennco and had there been a member of Stove Mounters Union, Local No. 153. He testified that when he came to Rivers he had a bumper sticker on his automobile evidencing his membership in that union; that he had several of these stickers in his automobile and that some other employees took and displayed them on their bumpers. He was unaware of how many did this, saying "I don't know anyone in particular. I just saw them on the cards [sic] there. There were a green Chevrolet it was on." Mayberry further said that he carried a "union handbook, wage scales and the

like" (apparently issued by Stove Mounters Union), which he showed to several of his co-employees at Rivers. This activity presumably occurred sometime prior to his discharge on October 2. Mayberry said that although his application for employment at Rivers revealed his former membership in the Stove Mounters Union, Mr. Rivers, who took his application, did not discuss the subject with him, and that at no time did any supervisory personnel ever discuss or mention a union in his presence. There was no evidence that any company representative ever noticed the one or more Stove Mounters' bumper stickers.

3) James Sanders, one of the alleged discriminatees, discharged on October 2, was employed on August 20, 1964. He swept and cleaned up for the first three days he was on the job and then was put to work as a welder. He testified to the following conversation with a night foreman, Lonnie Baker (whose status as a spokesman for the company was disputed):

Q. Did Lonnie Baker ever speak to you about the union?

A. Yes, sir.

* * * * * *

Q. And what was said?

A. Well, I talked about the rate of pay for welding; if welding didn't pay better than sweeping, I'd just as soon to have my broom back. At least I wouldn't burn up my clothes. *I said we needed a union around there. He said talking about the union around there, I wouldn't be there very long. I wouldn't have my job very long.* (Emphasis supplied.)

He further testified to a conversation with one Owen Barber, a plant supervisor as follows:

Q. Did Owen Barber speak to you about the union at any time?

A. Yes, sir.

Q. Did you tell us what was said in this conversation?

* * * * * *

A. Owen come around where I was working and wanted to know how I

was doing and so forth, talking about work, you know; wanted to know how I was getting along. I started complaining about $1.25 an hour for welding and told him *we needed a union around there* so I could get, maybe, better money like some of the others was getting, you know, for welding.

Q. Did Barber make any comment on this to you or say anything about it?

A. I told him that *we needed a union* and he said would I be in favor of anything like that. * * * He asked if I would be in favor of anything like that and *I told him I sure would.* (Emphasis supplied.)

The witness Sanders did not in any way relate these conversations in time or circumstance to the period when union cards were first obtained on September 23 and 24. Both of the above alleged discriminatees affirmed that as far as they knew no one in supervision was aware of the signing of the union cards or any other union activity; and in truth there was no evidence that except for the cards there was any union activity. The trial examiner foreclosed inquiry as to union meetings and the signing of cards by any others besides the alleged discriminatees, and would not allow company counsel to prove by a party not a discriminatee that a card bearing date September 24, 1963, had actually been signed long after October 2 and back dated to that day.

The foregoing is the total material from which the examiner and the Board inferred that the five employees discharged on October 2, 1964, were the victims of a company purpose "to interfere with, restrain or coerce employees in the exercise of the rights, guaranteed in Section 7," Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1) and to "discourage membership in any labor organization," Section 8(a) (3) of the Act. 29 U.S.C.A. § 158(a) (3). On the basis of what we have set out, the trial examiner said under his heading "C. The Dischargees,"

*"The October 2 dismissals.* In this setting of *intensive and extensive interference, restraint and coercion,* the Respondent terminated the employment of nine employees between October 2 and December 7, 1964, employees who, as will be noted below, were known by management to be union adherents."

\*　\*　\*　\*　\*　\*

" \* \* \* four had signed union cards for Sanders on September 23 or 24. Shelton solicited signatures from others. And Mayberry's interest in being a member of a labor organization *was plainly well known to management, since he had admitted on his application form, when hired, that he was a member of a union, and while employed always had a union sticker displayed on his car in which he rode to work."* (Emphasis supplied.)

 As to the October 2 discharges, the above inferences were, in our view, impermissible. We have held that the Board and its examiner may, without direct proof, infer illegal and discriminatory conduct by an employer, N. L. R. B. v. Bendix Corp., 299 F.2d 308, 310 (C.A. 6, 1962), cert. den. 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65; N. L. R. B. v. Power Equipment Co., 313 F.2d 438, 441 (C.A. 6, 1963); N. L. R. B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (C.A.6, 1964); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, 378 (1941); N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 107, 62 S.Ct. 960, 86 L.Ed. 1305, 1307 (1942), but a right to *infer* is not a right to *create.* We have the responsibility to inquire whether there is substantial evidence to support the conclusion reached by the examiner and affirmed by the Board, N. L. R. B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (C.A.6, 1964), even assuming that all of the above outlined testimony provided by the witnesses Mayberry and Sanders is true. That testimony, alone, does not provide sufficient factual background to allow an inference that the company knew that a union campaign was in progress, that the dischargees were active in such campaign, and that the terminations were made to frustrate the campaign and discourage membership in the union. Nor would the examiner's apparent view that the company's assigned reasons for the October discharges were neither valid nor credible provide the needed evidence of discriminatory motivation. See Lawson Milk Co. v. N. L. R. B., 317 F.2d 756, 760 (C.A.6, 1963).

 It was the burden of the General Counsel to prove the allegations of its complaint, to demonstrate that the company's action was motivated, at least in part, by anti-union bias. N. L. R. B. v Cleveland Trust Co., 214 F.2d 95, 99 (C.A.6, 1954); Lawson Milk Co. v. N. L. R. B., supra; N. L. R. B. v. Murray Ohio Mfg. Co., supra. That burden has not been carried here. The examiner's statement that,

"The evidence sustaining General Counsel's allegations that these October 2 discharges were designed to discourage further self organization *is overwhelming."* (Emphasis supplied.)

is without foundation. We therefore hold that the finding that the October 2 discharges were violative of Sections 8(a) (1) and (3) of the Act is not supported by "substantial evidence on the record as a whole."

This disposition of the matter renders moot petitioner's motion that we remand the case to the Board to hear evidence upon its claim that the October 2 dischargees had not in fact signed union cards on September 23 and 24. The motion was supported by the affidavit of R. T. Rivers that one of the October 2 dischargees (Mayberry) was prepared to testify that the cards purportedly signed on the September dates were in fact backdated after the discharges; it was further supported by an affidavit of another dischargee (Haley) that a representative of the union had arranged for such backdating. Without any investigation of these charges of false swearing, the Board denied the motion primarily upon procedural grounds.

The order of the Board so far as it relates to its finding that the October 2, 1964, discharges were violative of the Act is vacated and denied enforcement; in all other respects its order is enforced.