**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EVANS PACKING COMPANY, Respondent.**

No. 71–1973.

United States Court of Appeals, Sixth Circuit.

June 15, 1972.

**194**

Robert Bruce McLean, Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles N. Steele, Washington, D. C., on brief, for petitioner.

John E. Jenkins, Jr., Jenkins, Schaub & Fenstermaker, Huntington, W. Va., on brief, for respondent.

Before WEICK and McCREE, Circuit Judges, and FEIKENS *, District Judge.

McCREE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order requiring respondent to offer to reinstate, with backpay, Roger Bush, who was discharged on January 30, 1970. The order also requires respondent to cease and desist from committing an unfair labor practice found by the Board and to take certain affirmative remedial action. The Board determined that Bush's discharge violated section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), because respondent was motivated by Bush's participation in concerted activity protected by section 7 of the Act, 29 U.S.C. § 157.[1] The Board's decision and order are reported at 190 N.L.R.B. No. 70 (1971).

Respondent contends that the evidence is not sufficient to support the Board's determinations that Bush was engaged in protected concerted activity and that he was discharged because of the allegedly protected activity. We conclude that the Board's order should be enforced.

The underpinning of the Board's case is the timing of the discharge. Bush was employed in July 1968 and discharged on January 30, 1970. During the fall and early winter of 1969–70, Bush and other employees engaged in several discussions regarding payment rates for overtime work. They apparently concluded that the company should pay a daily overtime rate for any hours worked after eight hours in one day, whether or not the total hours worked in that week averaged more than eight for each working day or exceeded forty. On January 22, 1970, Bush and several other employees were discussing the subject in the company lunchroom when a foreman, Carl Hood, entered. Bush spoke up and asked what Hood "could do about getting us paid overtime for anything over eight hours a day." Hood responded, in effect, that he could not help, and that Bush would have to speak to higher management about it.

On January 29, Bush spoke to another foreman, William Frazee, about the same subject and received a similar answer. On January 30, foreman Hood informed Bush that Merle Evans, respondent's vice-president, secretary and plant manager, wanted to speak to him. Evans then discharged Bush and gave him a check for his wages. According to Bush, no explanation was offered, except

---

* The Honorable John Feikens, United States District Judge, Eastern District of Michigan, sitting by designation.

1. The applicable sections of the Act provide:

   [Sec. 157.] Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3).

   [Sec. 158.] (a) It shall be an unfair labor practice for an employer—

   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 . . . .

that Evans "mumbled something about staying in the locker room too long."

■■ We have no doubt that the described employee discussions about overtime pay and Bush's ensuing overtures to the foremen were protected concerted activities within section 7. NLRB v. Washington Aluminum Co., 370 U.S. 9, 14, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); NLRB v. Halsey W. Taylor Co., 342 F.2d 406, 408 (6th Cir. 1965). Accordingly, the discharge violated section 8(a) (1) of the Act if it was on account of these activities, as the temporal relationship between the incidents and the discharge suggests. *E. g.*, NLRB v. Tennessee Packers, Inc., 390 F.2d 782, 784 (6th Cir. 1968).

The Board additionally relies upon a history of company opposition to unionization, and a specific incident involving Bush, as indications that the company sought to suppress collective activity. The Trial Examiner credited Bush's testimony that he had been specifically rebuked in October 1969 for discussing with another employee the possible benefits of unionization, and discredited Evans' contrary testimony. Bush testified that he and Charlie Kinder sat in a bar and discussed unionization of the company:

> Well I asked Charlie about, what did he think of a union, and Charlie said that he wasn't for a union; and I told him, I said, "Well, Charlie, what's wrong?" . . . and he said "We'll . . . never get a union in here." And I asked him what he meant and he said—he said something about a 1960 election . . . . The union never went in, and Charlie had got a bawling out over this election so . . . [w]ell he said that it—there wasn't enough men out there, real men, that a union would ever go any place. . . .

The next day, Merle Evans and his brother Tim, the company president, called Bush into their office and chastised him for "talking union." According to Bush, "Merle Evans said that they never wanted to hear me or . . . that I'd ever talked about a union again."

Finally, the Board emphasizes on appeal, as did the Trial Examiner and the Board majority in their opinions, that the company has not been consistent in its explanation of the discharge. We have reviewed the record and noted the several inconsistent explanations proffered by company representatives. They are discussed in some detail in the Trial Examiner's opinion and in the Board's Decision and Order, and we need not describe them here. Although Bush was apparently an energetic person and capable of being a good worker, it is clear that he was far from a model employee. Testimony indicated that he had been involved in a fight on company premises approximately 15 months before his discharge; that, 2 or 3 months before his discharge, he had been reprimanded for spending too much time in the locker room; that he was repeatedly tardy; that he had been absent without a valid excuse on several occasions; and that his attendance problems apparently resulted from a hyperactive social life offensive to local morality and from excessive consumption of alcohol.

However, despite this pattern of behavior almost from the time he was hired, Bush was given eight merit wage increases during his 18 months employment. These increased his wage rate from $1.95 per hour to $3.15 per hour. Merle Evans testified that Bush, "as far as work is concerned, when he wanted to work he could be an excellent employee, and when he didn't want to, he could aggravate you to death." There was uncontradicted testimony from other witnesses that Bush worked hard, that he helped other employees when they needed help, and that he was occasionally assigned to train new employees.

■ We conclude that there is substantial evidence on the record considered as a whole to support the Board's conclusions. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Cavalier Olds, Inc., 421 F.2d 1234 (6th Cir.

1970). In reaching this conclusion, we observe that the Board majority rejected its Trial Examiner's recommendation that reinstatement be denied. The Supreme Court has provided the following direction to be followed in these circumstances:

> We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is "substantial."

*Universal Camera, supra,* 340 U.S. at 496–497, 71 S.Ct. at 469. Here, the Trial Examiner made credibility resolutions adverse to both parties. In at least one instance he credited a material part of Bush's testimony which was directly contradictory of Merle Evans' later testimony. And it further appears that the Trial Examiner decided the case upon a technicality and did not resolve the difficult factual issues. At the conclusion of his factual analysis, he stated:

> This brings us to a critical issue in this case: What about the timecards which Evans says are kept for 5 or 10 years? These records would establish whether in fact Bush's record in January was as inferior to that of the other employees as Evans declared. To be sure, the cards are in the Company's possession, and it could have produced them. However, it produced definitive testimony from Evans as to his motivation, and it is under no legal duty to produce substantiating documentation. General Counsel could have subpoenaed the records if he chose to challenge the bona fides of Evans' representation. In my view the timecards hold the key to the case, for, if they do not support Evans in this regard, I would view the scales as tipping in Bush's favor. To be sure, the Trial Examiner also has power to call witnesses and to require the production of evidence. Yet a Trial Examiner's function is to judge the case, not to prosecute it or defend it. After brief hesitation, not reflected on the record, I decided not to call for the timecards. This is an area in which, I am sure, other Trial Examiners as well as I would welcome the guidance of the Board. If in the Board's judgment the Trial Examiner in a case of his nature should himself call for the production of the documents, this case should be remanded. In its present posture, however, while I am by no means free of doubt, I would dismiss the complaint for failure of General Counsel to sustain his burden of proof.

In a footnote, the Trial Examiner also stated that:

> I am left with a nagging doubt as to why Evans stressed "tardiness" rather then "absenteeism" in his letter to the state authorities only a few weeks after Bush's discharge. Apparently Bush was guilty of both offenses, but tardiness was a matter of which others were also guilty. Both matters go to reliability in attendance, but Evans' letter is most specific as to "lateness."

The Board declined to provide the procedural direction which the Trial Examiner apparently sought. Instead it relied upon testimony in addition to that discussed by the Trial Examiner, and stated that:

> [t]he evidence is clear that Respondent tolerated among other employees

a considerable amount of tardiness and absenteeism. It has failed to show that, in comparison with other employees, Bush's absenteeism and tardiness record was greater than other employees'. [Footnote omitted.] Further, Respondent has failed to document the extent of the tardiness. We know not the reasons for the absences or whether the alleged tardiness was only a few minutes or several hours.

■ We, too, find it unnecessary to discuss the evidentiary issue raised by the Trial Examiner, although we observe that, when it would be natural under the circumstances for a party to introduce documents in his possession and he fails to do so, his failure may invoke an adverse inference. C. McCormick, Evidence § 249 (1954); II J. Wigmore, Evidence §§ 285, 291 (3d ed. 1940).

Enforcement granted.

WEICK, Circuit Judge (dissenting):

The Trial Examiner, who heard the witnesses and observed their demeanor, after holding that the General Counsel had established a prima facie case, found that it was rebutted by the testimony of Evans which he credited, and recommended a dismissal of the complaint. He stated:

> "To state that inferences are permissible and that a *prima facie* case exists is not to say, however, that they are inescapable, and that a finding must be made. In my judgment Evans' testimony concerning Bush's attendance in January rebutted the *prima facie* case. I was impressed not only with the amount of time Bush missed but also with Evans' testimony that absenteeism was not a problem with any other employee. At this point, it seems to me, the burden of going forward with the evidence reverted to General Counsel. I found Evans a credible witness in his testimony, and, in the absence of further evidence, I would dismiss the complaint.[2]" (footnote in Majority Opinion).

A divided panel of the Board, in reviewing the record, reversed the Trial Examiner and held that Evans violated Section 8(a) (1) of the Act and issued a cease and desist order requiring the Company to cease and desist from interfering with, restraining, and coercing its employees in the exercise of their Section 7 rights by discharging employees for engaging in activities protected by said section and granted affirmative relief requiring the Company to reinstate employee Bush with back pay.

Chairman Miller dissented, stating in his opinion:

> "I would adopt the findings, conclusions, and recommendations of the Trial Examiner.
>
> His analysis of the record and his application of burden of proof are, in my view, free of reversible error.
>
> As he points out, the Respondent's testimony (which he credits) as to the degree and amount of Bush's absenteeism, and to the effect that it was greater than that of other employees —("I mean it wasn't even close")— was not refuted by the General Counsel. It was the General Counsel's burden, once such testimony had been given, to establish, if he could, either by contrary testimony or by documentary evidence, that the testimony offered by Respondent was inaccurate or unreliable. He did not do so.
>
> In this state of the record, the Trial Examiner properly dismissed the complaint.
>
> Dated, Washington, D.C. May 19, 1971."

The complaint filed by General Counsel charged only a violation of Section 8(a) (1) of the Act. No charge was made in the complaint that the discharge of Bush violated Section 8(a) (3) of the Act which is the only section dealing with discharges. The Board

made no finding that the employer violated Section 8(a) (3).

Section 8(a) (3) of the Act, in pertinent part provides:

"(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

There was not a scintilla of evidence that the employer discriminated against Bush to discourage membership in the Union. The Board made no such finding. It wasn't even charged in the complaint.

In N.L.R.B. v. Ogle Protection Service, Inc., 375 F.2d 497, 505 (6th Cir. 1967), Judge Cecil, in writing the opinion for the Court stated:

"Section 158(a) (3), Title 29, U.S. C., makes it an unfair labor practice for an employer to discriminate 'in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.' It is unlawful for an employer to discharge an employee if the primary motivation therefore is his membership in or his activities on behalf of a labor organization. Subject to this qualification, the National Labor Relations Act does not restrict an employer's right to discharge his employees." (Citing authority.)

In *Ogle*, the employee was discharged because he came to work with the odor of liquor on his breath. Id. 506.

In N.L.R.B. v. McGahey, 233 F.2d 406, 410 (5th Cir. 1956), the Court held:

"The finding of 8(a) (1) guilt does not automatically make a discharge an unlawful one or, by supplying a possible motive, allow the Board, without more, to conclude that the act of discharge was illegally inspired. Indeed, we have frequently sustained 8(a) (1) charges while rejecting those under 8(a) (3)." (Citing authority.)

In N.L.R.B. v. Dan River Mills, Inc., 274 F.2d 381, 384 (5th Cir. 1960), the Court stated:

"Of course, the violation of § 8(a) (1) does not bring all discharges made during its pendency within § 8(a) (3). * * * A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the Union or its adherents. A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge." * * *

"The bias and coercive threats were fully established, but except for union membership nothing else was proved save these equivocal conversational exchanges to show that this employee's discharge came from a purpose to discriminate. This unlawful motive 'is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one.' "

The usual order issued by the Board when it finds a violation of § 8(a) (1) is to cease and desist while the order issued for a § 8(a) (3) violation is to reinstate with back pay.

In my opinion, the flimsiest kind of evidence was relied upon by the Board to support even an 8(a) (1) violation. It is detailed in the majority opinion as follows:

"On January 22, 1970, Bush and several other employees were discussing the subject (overtime pay) in the company lunchroom when a foreman, Carl Hood, entered. Bush spoke up and asked what Hood 'could do about getting us paid overtime for anything over eight hours a day.' Hood responded, in effect, that he could not help, and that Bush would have to speak to higher management about it.

On January 29, Bush spoke to another foreman, William Frazee, about the same subject and received a simi-

lar answer. On January 30, foreman Hood informed Bush that Merle Evans, respondent's vice-president, secretary and plant manager wanted to speak to him. Evans then discharged Bush and gave him a check for his wages. According to Bush, no explanation was offered, except that Evans 'mumbled something about staying in the locker room too long.' "

The company had been paying overtime for work in excess of forty hours a week. The discussions of the employees related to daily overtime where the total number of hours worked in an entire week did not exceed forty hours.

There was not a scintilla of evidence that these conversations, alleged to be protected activities, were ever communicated to the management of the company. There was no proof that Bush or any other employee of the company ever made any request of management for daily overtime pay. It is most significant that no employee, other than Bush, of the many employees involved in the discussions was discharged. This is substantial proof that the overtime discussions were not a motivating factor in the discharge of Bush. Kellwood Co. v. N.L.R.B., 411 F.2d 493, 498 (8th Cir. 1969). The fact is that Bush was properly discharged for other good and sufficient reasons.

The mere coincidence of the employee's alleged protected activity with his discharge will not support a discrimination. Broadway Motors Ford, Inc. v. N.L.R.B., 395 F.2d 337 (8th Cir. 1968); N.L.R.B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967).

Nor are suspicious circumstances that an employer may have been activated by unlawful motives in discharging an employee sufficient to support a finding of an unfair labor practice. Lozano Enterprises v. N.L.R.B., 357 F.2d 500 (9th Cir. 1966); Kellwood Company v. N.L.R.B., *supra*.

An inference must be based upon substantial evidence either direct or circumstantial and not upon mere surmise or suspicion.

As well stated in N.L.R.B. v. Ogle Protection Service, Inc., *supra*:

"The Board is limited to determining whether there was a discriminatory motive behind an employee's discharge, and not whether the Board agrees with the employer's reasons or even finds them unreasonable."

It is well settled in this Circuit that an employer may discharge an employee for any reason so long as he is not motivated by anti-union discrimination. As well stated in N.L.R.B. v. Bangor Plastics, Inc., 392 F.2d 772, 776 (6th Cir. 1967):

"The law is clear that an employer may discharge an employee for any reason whatsoever, so long as he is not motivated by anti-union discrimination. National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, rehearing den. 309 U.S. 696, 60 S.Ct. 611, 84 L.Ed. 1036; N.L.R.B. v. Challenge-Cook Brothers of Ohio, Inc., 374 F.2d 147 (C.A. 6); N.L.R.B. v. Ogle Protection Service, Inc., 375 F.2d 497 (C.A. 6), cert. den. 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108: Union membership and activities is not a shield behind which a discharged employee can take refuge and claim discrimination. N.L.R.B. v. Ogle Protection Service, Inc., supra; Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B., 330 F.2d 579 (C.A. 4), cert. den., 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88. The burden remains upon the General Counsel to prove that the reason for the discharge was the employer's anti-union hostility. An employer is not obliged to treat a union member differently or with greater deference than any of his other employees. Poor performance, misconduct and insubordination, for example, do not have to be tolerated merely because the offenders are among the plant's most active union supporters. An employer's stated opposition to unioniza-

tion is not in itself sufficient evidence to sustain a finding that an employee was discharged because of discrimination against a union. N.L.R.B. v. Ogle Protection Service, Inc., supra; N.L.R.B. v. Redwing Carriers, Inc., 284 F.2d 397 (C.A. 5)."

N.L.R.B. v. Ogle Protection Service, Inc., supra; R. J. Lison Co. v. N.L.R.B., 379 F.2d 814 (9th Cir. 1967); N.L.R.B. v. McGahey, 233 F.2d 406, 412 (5th Cir. 1956).

In Kellwood v. N.L.R.B., supra, the Court held that pro-union activities do not insulate an employee against a lawful discharge for cause. N.L.R.B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967). Also, an employer's general hostility toward a union does not, standing alone, supply unlawful motivation for a lawful discharge.

Plant Manager Evans testified that neither Hood or Frazee ever reported the alleged protected conversations about overtime pay to him, and he did not learn of them until after the charge had been filed in the present case. Notwithstanding the lack of any testimony to the contrary, the Trial Examiner and the Board did not credit Evans' testimony on this point. In a similar situation, the Court in N.L.R.B. v. Whitfield Pickle Company, 374 F.2d 576, 581 (5th Cir. 1967) said:

"The trial examiner and the Board find it 'incredible' that the company officers did not know of Mrs. Goodwin's union activities, but the barrenness of the record on this point indicates that their incredulity springs from nothing more than the assumption or suspicion that the officers' denials are false. The officers gave sworn testimony in an attempt to prove a negative: it can be well-nigh impossible to prove that one did not know something in the past by any other means than sworn denials. Such sworn testimony cannot be 'arbitrarily disregarded' because of the merest suspicion or assumption, without more, than the denials are lies. N.L.R.B. v. Atlanta Coca-Cola Bottling Co., 5 Cir. 1961, 293 F.2d 300, 306; Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456."

Even assuming, however, that the General Counsel had made out a prima facie case of a Section 8(a) (1) violation, the Trial Examiner found credible evidence to counter-balance it. He credited Plant Manager Evans' testimony concerning Bush's habitual tardiness and absenteeism and, on this basis, recommended a dismissal of the unfair labor practice charge. Absenteeism and tardiness constitute a proper and reasonable basis for discharge. DC International, Inc. v. N.L.R.B., 385 F.2d 215 (8th Cir. 1967); N.L.R.B. v. Blue Bell, Inc., 219 F.2d 796 (5th Cir. 1955).

Plant Manager Evans further testified that as far back as 1969 there were occasions when Bush was tardy and absent from work. This continued over the months to get progressively worse. In December, 1969, Bush was tardy five different days and absent a half day. In January, 1970, (month of discharge) he was absent four out of twenty working days and tardy on three other days. Evans had warned Bush on more than one occasion that the company would not put up with his tardiness, but these warnings had no effect. Bush had explanations, however for his tardiness but they were frivolous. One explanation was that he did not have the money to purchase an alarm clock. The other was that his automobile was wrecked in an accident. (He lived only two city blocks from the plant and he never claimed that he could not walk).

Bush was warned several time about spending too much time in the locker room.

He was involved in a fight at the plant with another employee about fifteen months before his discharge. More recently, in fact only two weeks before his discharge, he engaged in a fight with his own brother in a barroom argument over a woman and fractured his brother's nose. The majority opinion concedes that Bush's "attendance prob-

lems apparently resulted from a social life offensive to local morality and from excessive consumption of alcohol." The excessive consumption of alcohol also resulted in his coming to work under the influence of intoxicants and with a "hangover"; throwing up all over the place, leaving work and going home. There was testimony that his absenteeism occurred sometimes over weekends when he would not work on Fridays or Mondays, and would be out with the women. All of this happened in the little town of Gallipolis, Ohio, where respondent operated a small plant. Bush's misconduct was testified to by witnesses for the General Counsel who were fellow employees of Bush. In addition to the above, the company was frequently annoyed by Bush's creditors pressing for payment of his bills.

The hearsay evidence concerning the discussion between Bush and Charlie Kinder over the possible benefits of unionization, and Evans rebuking Bush for talking about the union, involved an isolated incident which took place in October, 1969. In any event, the employer has a right of free speech. 29 U.S.C. § 158(c).

As well stated in Lozano Enterprises v. N.L.R.B., *supra*:

"But it is well settled that an employer is not required to favor a union or refrain from opposing it, nor is it prohibited from expressing opposition to it. N.L.R.B. v. Threads, Inc. (4th Cir. 1962), 308 F.2d 1."

Both the Board and the majority rely on the fact that the employer did not introduce in evidence Bush's time cards. There was abundant testimony concerning Bush's tardiness and absenteeism without the cards and Bush did not deny it, but gave flimsy excuses for it. In any event, the burden of proof was not on Evans but on the General Counsel to establish the unfair labor practice. AHI Machine Tool & Die, Inc. v. N.L.R.B., 432 F.2d 190 (6th Cir. 1970); N.L.R.B. v. Bangor Plastics, Inc., 392 F.2d 772 (6th Cir. 1967); N.L.R.B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967); Rivers Manufacturing Corp. v. N.L.R.B., 376 F.2d 511 (6th Cir. 1967). The General Counsel recognized his deficiency when he filed a motion to reopen the case to subpoena the cards.

In Universal Camera Corp. v. N.L.R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), the Court stated:

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

It is apparent to me that, applying these standards, the evidence in this case lacks substantiality and that the order of the Board ought not to be enforced.