**JMC TRANSPORT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 84–5960, 84–6060.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 22, 1985.

Decided Nov. 12, 1985.

---

D. Patton Pelfrey, Charles E. Allen, III (argued), Brown, Todd and Heyburn, James

H. Massey, Mark B. Davis, Jr., Louisville, Ky., for petitioner.

Elliott Moore, Elinor Stillman (argued), Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before MERRITT and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

MERRITT, Circuit Judge.

JMC Transport, Inc. petitions for review of the decision and order of the National Labor Relations Board finding JMC in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1). In its decision and order, *JMC Transport, Inc.*, 272 N.L.R.B. No. 86 (1984), the three-member panel, with Chairman Dotson dissenting, affirmed the ALJ's finding that JMC had fired employee Lemuel Marina because of Marina's protected, concerted activity in challenging JMC's system of paying its drivers. The Board has filed a cross-application for enforcement of its order. On review this Court must determine whether there is substantial evidence for the Board's conclusion that Marina's activity was protected, concerted, and causally linked to his discharge. We hold that the Board's decision is supported by substantial evidence and therefore grant enforcement of the order.

## I.

Employee Lemuel Marina worked as an over-the-road driver for JMC from May 12, 1981, until November 5, 1981. When Marina first hired on, JMC's general manager was Kenneth Schweitzer. During the summer of 1981, Deanna Owens replaced Schweitzer as general manager; also at this time Thomas Denman was hired as operations manager. The president and part owner of JMC beginning in 1980 was Russell Broaddus.

When Marina hired on as a driver, Schweitzer explained that drivers received the following pay components: 20% of the truck revenue on single (one-driver) runs or 25% of the truck revenue on team runs;

$20 for each pickup and drop of merchandise after the first pickup and drop; $40 per load for unloading if the driver was required to unload; and 5% of the truck's quarterly revenue, plus vacation pay.

After Owens took Schweitzer's place as manager in 1981, she implemented a revision of the payment practice formerly administered by Schweitzer. Part of the reason for Schweitzer's removal was JMC's belief that he was not implementing the payment structure in accordance with the Company's wishes. Marina was upset by the changes because he believed that the changes reduced his actual pay.[1] Operations Manager Denman who was in charge of the drivers, called a meeting of drivers and distributed copies of the new policy. The drivers were then told to sign a copy of the proposed policy, signifying their understanding. Marina wrote at the bottom of his copy: "I agree with none of this."

Marina discussed the new pay structure with other drivers. Marina testified that he talked to the drivers in order to "see if any of them would be willing to go along" with him in challenging the policy and that he had gotten "assurance from the drivers that they would help" him. Trans. 66. Practically all the drivers talked to the company's maintenance shop foreman about the changes when they were in the garage.

Marina voiced his disagreement to both Owens and Denman. On several occasions, Marina lost his self-control and became verbally abusive to both Owens and Denman. He used heavy profanity and pounded his fist on desks. The Company alleges in its brief that Marina made specific threats on two occasions, but the record does not clearly support that contention. On one occasion, however, the company security guard was called to stand by. The company did not fire Marina for any of these outbursts.

Marina first expressed his opinion to Denman and Owens in September. He challenged the recently instituted policy concerning payments for stop charges and unloading, and attempted to prove that Broaddus had been aware of the earlier practice of paying drivers.

In early October, Marina and his co-driver, Terry Cathey, went to Denman's office to complain about the pay structure. Marina was the lead driver for the team and handled all the paper work; he did the talking at the meeting, but the Board found he was speaking, not only on his own behalf, but for Cathey as well. Denman attempted to explain the pay structure to both Cathey and Marina. At that meeting, Marina reiterated his belief, expressed earlier in Owens' office, that the company was taking money that rightfully belonged to the drivers. The specific changes discussed pertained to the overall formula change and the method of paying stop charges. Cathey testified, however, that he remembered discussion of the $40 unloading payment as well.

In late September or October, Marina again protested the pay procedures to General Manager Owens. He entered her office and demanded that he be paid for certain charges. He became extremely angry; it was at this meeting that Keck, the security guard, was called to stand by.

Finally, on November 3, Marina had just completed one leg of a run to and from California; he brought his truck into the JMC terminal on a stop-over to his final destination of Columbus, Ohio.

When he arrived at the JMC terminal on November 3, he parked his tractor and

---

1. The first changes were an effort by the company simply to begin enforcing pre-existing policy. These changes relate to unloading payments and stop charges. Owens had determined that Schweitzer had been paying drivers $10 for each extra stop, regardless of whether the freight was regulated or unregulated. He also was paying drivers for unloading both palletized and non-palletized freight. The second set of changes was in response to changed ICC regulations, and evidently did not result in any actual reduction in pay, although Marina perceived the changes as having that effect. The company reduced the drivers' percentage of revenue, but the base was simultaneously increased so that the drivers were actually supposed to receive the same as or more than before.

partially-loaded trailer near the terminal mechanic's shop. Later that afternoon, he went to pick up his paycheck for an earlier run completed by himself and his co-driver, during which they had manually unloaded freight on pallets. Marina's paycheck did not reflect payment for the unloading, and he immediately confronted Denman on the issue. Denman responded that the company policy was to not pay drivers for unloading palletized loads, and that the company did not owe Marina for his labor. Marina once again lost control at this meeting; he cursed and argued that he was being cheated out of his money.

Shortly after this encounter the incident occurred which the Company asserted as its reason for firing Marina. Marina returned to his truck to complete his run to Columbus at approximately 9:00 P.M. on the evening of his dispute with Denman, November 3. The terminal mechanic, the nephew of manager Denman, had moved and locked Marina's truck and secured the terminal before leaving at 5:00 P.M. Marina therefore could not leave to complete his run, which was due in Columbus the following day.

Marina called Denman in order to get the keys to his truck. Denman responded that he would be there in 45 minutes. Marina then went back to the terminal and waited until 11:30 or 11:45 P.M. when he left and returned home because Denman had not come.

Denman arrived at the terminal at about 11:50 P.M. After Marina's call, Denman had called Owens at home, who told Denman not to go to the terminal alone. He then had contacted Keck, the Company's security contractor, who accompanied Denman to the terminal along with J.R. Denman, the terminal mechanic. After finding Marina gone, the Denmans left, and Keck stood guard at the terminal all night.

When Owens arrived at work the next morning, Keck told her that he and the two others had seen two cans of unopened beer in Marina's truck the night before, and that he had stood guard on the truck all night. Owens then reported this information to

Broaddus, the company president; they agreed that Marina should be fired because of the beer. Because Denman was not yet at the office, however, they decided to wait until they could confirm the incident with him, "because he was the person who was present when all this happened." JA 243.

That morning, Marina reported for work and was called to a meeting with Broaddus. No mention was made of the beer. Broaddus asked Marina, "What's all the noise you been making up here, and this is not the first time?" They then discussed the Company's pay structures and other policies, including the company's alcoholic beverage policy. After this meeting, Marina went out to the shop area and talked to some of the drivers about what had just happened and about finding a way "to recover all of these losses that—the pay that the company was trying to get out of paying us." He then contacted Teamsters Local 89 and set up an appointment to talk with them on November 5.

Denman, who alone had access to the keys to the truck, did not come in until later that day. When Denman, Owens, the company dispatcher and the shop foreman went out to inspect Marina's truck, there was no beer in it. Denman stated, however, that Marina had had beer in the truck the night before and that they were going to have to fire him. According to the testimony of shop foreman Sanders, about one week before this, Denman had "said that if Mr. Marina didn't change, quit raising such a hassle about the pay, in a round-about way that he was going to be fired." JA 155.

On the afternoon of November 5, Marina met with Broaddus, Owens, and Denman at the terminal. Broaddus asked Marina what he was doing with beer in his truck when he knew it was against company policy. Marina vehemently denied having had any beer in his truck, saying that he did not drink beer. Broaddus told Marina that he was fired; Marina responded by swearing at the group as he left.

Both the ALJ and the Board found that the alleged beer incident was a sham based

on false reports and that the Company had violated section 8(a)(1) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(1) in discharging Marina because of his protected concerted activity of protesting changes in the Company's pay system. Chairman Dotson dissented from the panel's decision, disagreeing with the majority's conclusion that Marina's activity was concerted. The Board, also in agreement with the ALJ, dismissed those portions of the complaint alleging that the Company violated sections 8(a)(1) and (3) of the Act by discriminatorily discharging Marina because of his union activities. The Board found no evidence that the Company knew of these activities.

The Board's order requires the Company to cease and desist from violating employees' section 7 rights. 29 U.S.C. § 157 (1982). It also requires JMC to offer Marina immediate and full reinstatement to his former job or one substantially equivalent, and, among other related remedies, to make him whole for any wage loss. The Company petitions for review of the decision and order, and the Board cross-petitions for enforcement.

## II.

### A.

The majority of the Board found that Marina's activity concerning the pay changes was concerted activity under the Board's newly-announced touchstone in *Meyers Industries, Inc.*, 268 N.L.R.B. 493, 497 (1984), *remanded sub nom. Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.1985), which requires that the activity "be engaged in with, or on the authority of, other employ-

ees, and not solely by and on behalf of the employee himself." *Id.*[2]

The Board emphasized the October meeting Marina and his co-driver Cathey had with Denman to discuss the changes in the way wage payments were calculated. The Board found that this meeting evidenced both the concerted nature of Marina's activity overall and the company's actual knowledge of the concerted nature of the activity, a criterion required in this Circuit under *Jim Causley, Inc. v. NLRB*, 620 F.2d 122 (6th Cir.1980). The Board then interpreted the November 3 complaint by Marina, although expressly dealing only with a discrepancy in Marina's check based on unloading that both he and Cathey had performed, as an event that "grew out of the earlier concerted complaint regarding the same subject matter, i.e., the change in wage structure." Board Order at 2, n. 2. JA 2. Thus, in the Board's view the dismissal-triggering episode constituted concerted activity.

The Company's theory is that Marina's activity was not concerted for purposes of section 7 of the Labor Management Relations Act. It reasons that on the date of the dismissal-triggering activity Marina was protesting simply his own paycheck and the lack of payment for the pallets which he and his co-driver had unloaded. It emphasizes Chairman Dotson's dissent, which characterized Marina's actions on November 3 as an individual complaint to management "that his check did not include an unloading payment to which he felt entitled." JA 4. The Company also argues that the October meeting between Marina and Cathey and Denman was not

---

**2.** Section 7 of the Labor Management Relations Act provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition

of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157 (1982). This Court in defining the boundaries of concerted activity has required that the action be taken "on behalf of other employees or at least ... with the object of inducing or preparing for group action...." *ARO, Inc. v. NLRB*, 596 F.2d 713, 716 (6th Cir. 1979), and that "the fact that the employees do not formally choose a spokesman and do not go together to see management does not negate concert of action." *Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 124 (6th Cir.1980).

concerted action on the theory that Cathey was merely an inadvertent bystander. *See Meyers, supra; Mazer Chemicals, Inc.,* 270 N.L.R.B. 241 (1984).

The Company's theory is contrary to the rationale of the *Meyers* case. The rationale of *Meyers* is to afford concerted status to those activities that reflect actual group will in the workplace. The Board reasoned in *Meyers* that its earlier doctrine in *Alleluia Cushion,* 221 N.L.R.B. 999 (1975), erroneously equated that which *"ought to be* of group concern" with that which actually *was* of group concern. *Meyers,* 268 N.L.R.B. at 496. To ensure a more than theoretical concern, the *Meyers* touchstone requires that the activity be engaged in either "with or on the authority of other employees." [3]

The record reveals substantial evidence showing that Marina acted both with *and* on the authority of other employees.

■ First, the Board correctly relied on the meeting that Cathey and Marina had with Denman as evidence that Marina had acted in concert with another employee to express concern over the pay structure. Cathey testified that together he and Marina went to see Denman in his office to discuss the pay structure. Unlike the worker in *Mazer Chemicals,* for example, who was simply present in a break room at the beginning of a shift when a conversation took place between the complaining employee and management, Cathey was no inadvertent bystander. *See Mazer Chemicals, Inc.,* 270 N.L.R.B. 241, ALJ Decision at 6 (1984).

Cathey also testified that Denman tried to explain the changes both to him and

Marina, and that Marina expressed the concern that the Company was "taking our money." JA 167. The Company, thus, was on notice that Marina's activity was concerted. *Jim Causley, Inc. v. NLRB,* 620 F.2d 122 (6th Cir.1980).

■ Second, Marina discussed the changes with other drivers. His uncontradicted testimony was that he had gotten "assurance from the drivers that they would help him." JA 125.[4] Practically all the drivers talked to the Company's maintenance shop foreman about the changes when the drivers were in the garage. The ALJ noted that between 12 and 20 drivers commented in writing on the revisions when they signed copies of the policy changes. These were objective manifestations of group will constituting substantial evidence for finding concerted activity.

**B.**

■ The Board also found that Marina's conduct was protected. In doing so, the Board reasoned that, since the Company had not chosen to fire Marina based on his extremely hostile and abusive outbursts, the Company was foreclosed from arguing after the fact that Marina's conduct was unprotected.

Courts have heretofore addressed the concept of unprotected activity only in cases in which the employer *expressly* fired the employee for the very behavior challenged as unprotected. *See, e.g., NLRB v. City Disposal Systems,* 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). The Board has made these determinations as well. *See Fibracan Corp.,* 259 N.L.R.B. 14 (1981); *New Process Gear,* 249 N.L.R.B.

---

3. The validity of the Board's new definition of section 7 concerted activity has yet to be judicially upheld. In *Prill v. NLRB,* 755 F.2d 941 (D.C.Cir.1985), the Court remanded the *Meyers* case on the basis that the Board had concluded erroneously that its new definition was literally compelled by the Act itself. *Id.* at 948. The D.C. Circuit also observed that the *Meyers* test was more restrictive than the Board's own pre-*Alleluia* standard. The Court remanded *Meyers* for reconsideration "because the Board's decision stands on a faulty legal premise and without adequate rationale." *Id.* Because we find

that the activity here was concerted even given the more restrictive *Meyers* standard, we do not reach the question whether the *Meyers* standard is an appropriate interpretation of section 7 activities.

4. This important factor distinguishes the present case from the factual situation in *Meyers,* in which no such assurances had been made, and the Board found no concerted activity. 268 N.L.R.B. at 499.

158 (1980). The concept of unprotected activity has not been used when it was not the basis of the discharge, but rather, in a context in which a discharge is based on specific, allegedly unprotected conduct. In that context, behavior as outrageous as Marina's clearly could be seen as unprotected, even in a work environment which may tolerate a high degree of rough language or behavior.

Although we in no way condone Marina's conduct, we decide that the Company's failure to fire Marina for his abusive conduct defeats its contention that Marina's conduct was unprotected. In a context in which the employer has not found the conduct so disruptive as to justify discharge at the time, we decline to impose a post hoc classification of unprotected conduct. If anti-labor animus was the reason for a discharge, it may not be excused by pointing to earlier, known conduct which could have, but did not in fact, lead to discharge.

### C.

█ Having determined that Marina's conduct was both concerted and protected, the ALJ then concluded that Marina's protected activity was the cause of his discharge. First, the ALJ found as a matter of fact that the alleged beer episode was a fabrication. In doing so, the ALJ discredited the testimony of the two witnesses who testified for JMC about the incident.

The Company urges us to reverse the ALJ's credibility determinations, citing this Court's decision in *Krispy Kreme Doughnut Corp. v. NLRB,* 732 F.2d 1288 (6th Cir.1984), as authority. As we observed in *Krispy Kreme,* however, we reversed the credibility determinations there with ex-

treme reluctance based on the "unusual facts" of that case. *Id.* at 1293. The factual circumstances in this case are fundamentally different from those in *Krispy Kreme.*[5] We hold that the ALJ's finding, based on his having observed the witnesses' demeanor and on having analyzed the circumstantial evidence, is supported by substantial evidence.

█ Second, the testimony of the shop foreman, who testified that Denman had earlier suggested that Marina would be fired if he continued "raising such a hassle about the pay," JA 155, serves to establish Denman's unlawful animus against the protected activity, *see NLRB v. Valley Plaza, Inc.,* 715 F.2d 237, 241 (6th Cir.1983); *NLRB v. Evans Packing Co.,* 463 F.2d 193, 195 (6th Cir.1972). The record further shows that Denman's corroboration of the fabricated beer episode was a significant factor in Broaddus' and Owens' management decision to terminate Marina. The two waited to act on the reported beer incident until they could speak to Denman, because "he was the person who was there"; after confirming the story with him, they fired Marina. Under these circumstances, a supervisor's unlawful, anti-labor motivation in making a false report leading to discharge must be imputed to the Company, even though the officers who actually make the firing decision do not share that animus. *See Boston Mutual Life Ins. Co. v. NLRB,* 692 F.2d 169, 171 (1st Cir.1982); *Allegheny Pepsi-Cola Bottling Co. v. NLRB,* 312 F.2d 529, 531 (3d Cir.1962). Thus, the Company is deemed to possess the unlawful animus.[6]

---

5. In *Krispy Kreme,* there was testimony that the union organizer witness, credited by the ALJ, had discussed forgoing signatures on authorization cards; his testimony at hearing differed from his earlier affidavit on the very point in issue (i.e., whether he had offered to waive initiation fees for those that signed authorization cards); testimony against him on the point came from both union and non-union supporters; and circumstantial evidence weighed heavily against him.

6. This same rationale defeats the Company's argument that, when an employee is fired for misconduct unassociated with section 7 activities, the only relevant issue is whether the executive who makes the firing decision has a good faith belief that the misconduct occurred. *See NLRB v. Howell Automatic Machine Co.,* 454 F.2d 1077 (6th Cir.1972). Allowing a company to assert good faith when one of its supervisors was a primary actor in the fabrication leading to the discharge simply runs counter to any logical definition of good faith.

■ Third, the proximity in time between the protected activity and the discharge serves as an indicia of the Company's unlawful motivation. *See NLRB v. Garon*, 738 F.2d 140, 147 (6th Cir.1984).

■ There is, therefore, substantial evidence in the record for the Board's finding that Marina's protected concerted activity was a motivating factor in the Company's decision to fire Marina.

Accordingly, we grant enforcement of the Board's order.

WELLFORD, Circuit Judge, dissenting.

For the reasons stated in N.L.R.B. Chairman Dotson's dissent, I also disagree with my colleague's decision, which concluded that Marina engaged in concerted activity "when he individually complained to management that his check did not include an unloading payment to which he felt entitled." (J.A. 4). Marina's prior meeting with operations manager Denman in early October, 1981 concerned a separate issue, the percentage employees were being paid on gross revenues from hauling.[1] I agree with Chairman Dotson's analysis that "there is *no evidence* to support the view that the 3 November complaint involved *concerted* activity." (emphasis added, J.A. 4). At the time of this later incident over an unloading payment on one particular trip involving Marina, he made no reference whatever to the earlier disagreement and argument. Marina was discharged following the later heated incident when JMC Transport's management reasonably believed he had beer on his truck contrary to its rules. The discharge, then, did not involve any concerted activity on the part of Marina.

Furthermore, petitioner was justified in my view for discharging Marina by reason of his misconduct and inflammatory behavior towards his superiors. A third party testified, and Marina did not deny that he had addressed Owens as a "white bitch" and Denman in an even more demeaning way, and threatened to "get them." On the later occasion, shortly before his termination, he accused them of taking his money and by his own admission "went to pieces" and "lost self control" in railing against them and the employer JMC Transport because they did not pay *his own* claimed unloading pay. At no time in this abusive confrontation did Marina discuss any other employee's unloading pay. The ALJ characterized Marina's conduct as "extremely intemperate," and acknowledged that it gave Respondent "ample grounds to discharge" him.

I conclude that Marina was not engaged in protected activity in his uncontrolled confrontation with management in November. Even if he were deemed to be so engaged, however, I would deny him the protection he seeks under the circumstances.

An employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7. *N.L.R.B. v. City Disposal Systems, Inc.*, 465 U.S. 822, ——, 104 S.Ct. 1505, 1514, 79 L.Ed.2d 839, 853 (1985).

The abusive conduct here occurred within a few days of his discharge. It was related to the discharge, and similar conduct has been held to foreclose a claim of protected activity. *See New Process Gear*, 249 N.L.R.B. # 158 (1980). The Board has taken a recent more restricted view of concerted activity to require action "with or on the authority of other employees," as noted in the majority opinion. *See Meyers Industries, Inc.*, 268 N.L.R.B. 493 (1984) *remanded sub. nom., Prill v. N.L.R.B.* 755 F.2d 941 (D.C.Cir.1985). There was no action by authority of other employees taken by Marina in this case.

I would deny enforcement of the Board's order accordingly.

---

1. *See* footnote 1 of the majority opinion. The parties do not seem to disagree that on this issue the drivers were being paid the *same amount* computed on a different basis calculated on a slightly changed percentage. Thus, in any event, Marina obviously had no legitimate complaint about the change in percentage adversely affecting him or any other similarly situated driver.